HOUSEHOLD CREDIT SERVICES, INC., ET AL. *v.*
PFENNIG

No. 02–857.   Argued February 23, 2004—Decided April 21, 2004

_Seth P. Waxman_ argued the cause for petitioners. With him on the briefs were _Louis R. Cohen, Christopher R. Lipsett, Richard C. Pepperman II,_ and _William G. Porter._

_Barbara B. McDowell_ argued the cause for the United States as _amicus curiae_ urging reversal. With her on the brief were _Solicitor General Olson, Assistant Attorney General Keisler, Deputy Solicitor General Clement, Matthew D. Roberts, James V. Mattingly, Jr.,_ and _Katherine H. Wheatley._

_Sylvia Antalis Goldsmith_ argued the cause for respondent. With her on the brief were _John T. Murray, Joseph F. Murray,_ and _Brian K. Murphy._*

---

*Briefs of _amici curiae_ urging reversal were filed for the American Bankers Association et al. by _Drew S. Days III, Beth S. Brinkmann,_ and _Seth M. Galanter;_ and for William P. Schlenk by _Richard A. Cordray, Mark D. Fischer,_ and _Mark McClure Sandmann._

JUSTICE THOMAS delivered the opinion of the Court.

Congress enacted the Truth in Lending Act (TILA), 82 Stat. 146, in order to promote the "informed use of credit" by consumers. 15 U. S. C. § 1601(a). To that end, TILA's disclosure provisions seek to ensure "meaningful disclosure of credit terms." *Ibid.* Further, Congress delegated expansive authority to the Federal Reserve Board (Board) to enact appropriate regulations to advance this purpose. § 1604(a). We granted certiorari, 539 U. S. 957 (2003), to decide whether the Board's Regulation Z, which specifically excludes fees imposed for exceeding a credit limit (over-limit fees) from the definition of "finance charge," is an unreasonable interpretation of § 1605. We conclude that it is not, and, accordingly, we reverse the judgment of the Court of Appeals for the Sixth Circuit.

I

Respondent, Sharon Pfennig, holds a credit card initially issued by petitioner Household Credit Services, Inc. (Household), but in which petitioner MBNA America Bank, N. A., now holds an interest through the acquisition of Household's credit card portfolio. Although the terms of respondent's credit card agreement set respondent's credit limit at $2,000, respondent was able to make charges exceeding that limit, subject to a $29 "over-limit fee" for each month in which her balance exceeded $2,000.

TILA regulates, *inter alia*, the substance and form of disclosures that creditors offering "open end consumer credit plans" (a term that includes credit card accounts) must make to consumers, § 1637(a), and provides a civil remedy for consumers who suffer damages as a result of a creditor's failure to comply with TILA's provisions, § 1640.[1] When a creditor

---

[1] An "open end credit plan" is a plan under which a creditor "reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U. S. C. § 1602(i).

and a consumer enter into an open-end consumer credit plan, the creditor is required to provide to the consumer a statement for each billing cycle for which there is an outstanding balance due. § 1637(b). The statement must include the account's outstanding balance at the end of the billing period, § 1637(b)(8), and "[t]he amount of any finance charge added to the account during the period, itemized to show the amounts, if any, due to the application of percentage rates and the amount, if any, imposed as a minimum or fixed charge," § 1637(b)(4). A "finance charge" is an amount "payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." § 1605(a). The Board has interpreted this definition to exclude "[c]harges . . . for exceeding a credit limit." See 12 CFR § 226.4(c)(2) (2004) (Regulation Z). Thus, although respondent's billing statement disclosed the imposition of an over-limit fee when she exceeded her $2,000 credit limit, consistent with Regulation Z, the amount was not included as part of the "finance charge."

On August 24, 1999, respondent filed a complaint in the United States District Court for the Southern District of Ohio on behalf of a purported nationwide class of all consumers who were charged or assessed over-limit fees by petitioners. Respondent alleged in her complaint that petitioners allowed her and each of the other putative class members to exceed their credit limits, thereby subjecting them to over-limit fees. Petitioners violated TILA, respondent alleged, by failing to classify the over-limit fees as "finance charges" and thereby "misrepresented the true cost of credit" to respondent and the other class members. Class Action Complaint in No. C2–99 815, ¶¶ 34–39, App. to Pet. for Cert. A39–A40. Petitioners moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that Regulation Z specifically excludes over-limit fees from the definition of "finance charge." 12 CFR

§ 226.4(c)(2) (2004). The District Court agreed and granted petitioners' motion to dismiss.

On appeal, respondent argued, and the Court of Appeals agreed, that Regulation Z's explicit exclusion of over-limit fees from the definition of "finance charge" conflicts with the plain language of 15 U. S. C. § 1605(a). The Court of Appeals first noted that, as a remedial statute, TILA must be liberally interpreted in favor of consumers. 295 F. 3d 522, 528 (CA6 2002). The Court of Appeals then concluded that the over-limit fees in this case were imposed "incident to the extension of credit" and therefore fell squarely within § 1605's definition of "finance charge." *Id.*, at 528–529. The Court of Appeals' conclusion turned on the distinction between unilateral acts of default and acts of default resulting from consumers' requests for additional credit, exceeding a predetermined credit limit, that creditors grant. Under the Court of Appeals' reasoning, a penalty imposed due to a unilateral act of default would not constitute a "finance charge." *Id.*, at 530–531. Respondent alleged in her complaint, however, that petitioners "allowed [her] to make charges and/or assessed [her] charges that allowed her balance to exceed her credit limit of two thousand dollars," App. to Pet. for Cert. A39, ¶ 34, putting her actions under the category of acts of default resulting from consumers' requests for additional credit, exceeding a predetermined credit limit, that creditors grant. The Court of Appeals held that because petitioners "made an additional extension of credit to [respondent] over and above the alleged 'credit limit,'" *id.*, ¶ 35, and charged the over-limit fee as a condition of this additional extension of credit, the over-limit fee clearly and unmistakably fell under the definition of a "finance charge." 295 F. 3d, at 530. Based on its reading of respondent's allegations, the Court of Appeals limited its holding to "those instances in which the creditor knowingly permits the credit card holder to exceed his or her credit limit and then imposes

a fee incident to the extension of that credit." *Id.*, at 532, n. 5.[2]

## II

Congress has expressly delegated to the Board the authority to prescribe regulations containing "such classifications, differentiations, or other provisions" as, in the judgment of the Board, "are necessary or proper to effectuate the purposes of [TILA], to prevent circumvention or evasion thereof, or to facilitate compliance therewith." § 1604(a). Thus, the Court has previously recognized that "the [Board] has played a pivotal role in 'setting [TILA] in motion. . . .'" *Ford Motor Credit Co.* v. *Milhollin,* 444 U. S. 555, 566 (1980) (quoting *Norwegian Nitrogen Products Co.* v. *United States,* 288 U. S. 294, 315 (1933)). Indeed, "Congress has specifically designated the [Board] and staff as the primary source for interpretation and application of truth-in-lending law." 444 U. S., at 566. As the Court recognized in *Ford Motor Credit Co.,* twice since the passage of TILA, Congress has made this intention clear: first by providing a good-faith defense to creditors who comply with the Board's rules and regulations, 88 Stat. 1518, codified at 15 U. S. C. § 1640(f), and, second, by expanding this good-faith defense to creditors who conform to "any interpretation or approval by an official or employee of the Federal Reserve System duly authorized by the Board to issue such interpretations or approvals," 90 Stat. 197, codified as amended, at § 1640(f). 444 U. S., at 566–567.

Respondent does not challenge the Board's authority to issue binding regulations. Thus, in determining whether

---

[2] To the extent that respondent sought monetary relief, the Court of Appeals affirmed the District Court's dismissal of respondent's TILA claim because § 1640(f) provides a good-faith defense to creditors who act in conformity with rules promulgated by the Board. 295 F. 3d, at 532–533.

Regulation Z's interpretation of TILA's text is binding on the courts, we are faced with only two questions. We first ask whether "Congress has directly spoken to the precise question at issue." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842 (1984). If so, courts, as well as the agency, "must give effect to the unambiguously expressed intent of Congress." *Id.*, at 842–843. However, whenever Congress has "explicitly left a gap for the agency to fill," the agency's regulation is "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." *Id.*, at 843–844.

## A

TILA itself does not explicitly address whether over-limit fees are included within the definition of "finance charge." Congress defined "finance charge" as "all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." § 1605(a). The Court of Appeals, however, made no attempt to clarify the scope of the critical term "incident to the extension of credit." The Court of Appeals recognized that, " '[i]n ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.' " 295 F. 3d, at 529–530 (quoting *K mart Corp.* v. *Cartier, Inc.*, 486 U. S. 281, 291 (1988)). However, the Court of Appeals failed to examine TILA's other provisions, or even the surrounding language in § 1605, before reaching its conclusion. Because petitioners would not have imposed the over-limit fee had they not "granted [respondent's] request for additional credit, which resulted in her exceeding her credit limit," the Court of Appeals held that the over-limit fee in this case fell squarely within § 1605(a)'s definition of "finance charge." 295 F. 3d, at 528–529. Thus, the Court of Appeals rested

its holding primarily on its particular characterization of the transaction that led to the over-limit charge in this case.[3]

The Court of Appeals' characterization of the transaction in this case, however, is not supported even by the facts as set forth in respondent's complaint. Respondent alleged in her complaint that the over-limit fee is imposed for each month in which her balance exceeds the original credit limit. App. to Pet. for Cert. A39, ¶ 35. If this were true, however, the over-limit fee would be imposed not as a direct result of an extension of credit for a purchase that caused respondent to exceed her $2,000 limit, but rather as a result of the fact that her charges exceeded her $2,000 limit at the time respondent's monthly charges were officially calculated. Because over-limit fees, regardless of a creditor's particular billing practices, are imposed only when a consumer exceeds his credit limit, it is perfectly reasonable to characterize an over-limit fee not as a charge imposed for obtaining an extension of credit over a consumer's credit limit, but rather as a penalty for violating the credit agreement.

The Court of Appeals thus erred in resting its conclusion solely on this particular characterization of the details of credit card transactions, a characterization that is not clearly compelled by the terms and definitions of TILA, and one with which others could reasonably disagree. Certainly, regardless of how the fee is characterized, there is at least some connection between the over-limit fee and an extension of credit. But, this Court has recognized that the phrase

---

[3] Respondent does not attempt to defend the Court of Appeals' reasoning in this Court and has abandoned her principal argument on appeal—that Regulation Z conflicts with the plain language of § 1605. Instead, respondent maintains that the Board's exclusion of over-limit fees in Regulation Z is not challenged in this case because Regulation Z does not cover over-limit fees imposed for authorized extensions of credit. Because respondent did not advance this theory in the Court of Appeals, and did not raise it in her brief in opposition accompanied by an appropriate cross-petition, see *Northwest Airlines, Inc.* v. *County of Kent,* 510 U. S. 355, 364 (1994), we decline to consider it here.

"incident to or in conjunction with" implies some *necessary* connection between the antecedent and its object, although it "does not place beyond rational debate the nature or extent of the required connection." *Holly Farms Corp.* v. *NLRB*, 517 U. S. 392, 403, n. 9 (1996) (internal quotation marks omitted). In other words, the phrase "incident to" does not make clear whether a substantial (as opposed to a remote) connection is required. Thus, unlike the Court of Appeals, we cannot conclude that the term "finance charge" unambiguously includes over-limit fees. That term, standing alone, is ambiguous.

Moreover, an examination of TILA's related provisions, as well as the full text of § 1605 itself, casts doubt on the Court of Appeals' interpretation of the statute. A consumer holding an open-end credit plan may incur two types of charges— finance charges and "other charges which may be imposed as part of the plan." §§ 1637(a)(1)–(5). TILA does not make clear which charges fall into each category. But TILA's recognition of at least two categories of charges does make clear that Congress did not contemplate that *all* charges made in connection with an open-end credit plan would be considered "finance charges." And where TILA does explicitly address over-limit fees, it defines them as fees imposed "in connection with an extension of credit," § 1637(c)(1)(B)(iii), rather than "incident to the extension of credit," § 1605(a). Furthermore, none of § 1605's specific examples of charges that fall within the definition of "finance charge" includes over-limit or comparable fees. See, *e. g.*, § 1605(a)(2) ("[s]ervice or carrying charge"); § 1605(a)(3) (loan fee or similar charge); § 1605(a)(6) (mortgage broker fees).[4]

---

[4] Additionally, by specifically excepting charges from the term "finance charge" that would otherwise be included under a broad reading of "incident to the extension of credit," see § 1605(a) (charges of a type payable in a comparable cash transaction); *ibid.* (fees imposed by third-party closing agents); § 1605(d)(1) (fees and charges relating to perfecting security interests); § 1605(e) (fees relating to the extension of credit secured by real

As our prior discussion indicates, the best interpretation of the term "finance charge" may exclude over-limit fees. But § 1605(a) is, at best, ambiguous, because neither § 1605(a) nor its surrounding provisions provides a clear answer. While we acknowledge that there may be some fees not explicitly addressed by § 1605(a)'s definition of "finance charge" but which are unambiguously included in or excluded by that definition, over-limit fees are not such fees.

## B

Because § 1605 is ambiguous, the Board's regulation implementing § 1605 "is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *United States* v. *Mead Corp.*, 533 U. S. 218, 227 (2001).

Regulation Z's exclusion of over-limit fees from the term "finance charge" is in no way manifestly contrary to § 1605. Regulation Z defines the term "finance charge" as "the cost of consumer credit." 12 CFR § 226.4 (2004). It specifically excludes from the definition of "finance charge" the following:

"(1) Application fees charged to all applicants for credit, whether or not credit is actually extended.

"(2) Charges for actual unanticipated late payment, *for exceeding a credit limit*, or for delinquency, default, or a similar occurrence.

"(3) Charges imposed by a financial institution for paying items that overdraw an account, unless the payment of such items and the imposition of the charge were previously agreed upon in writing.

"(4) Fees charged for participation in a credit plan, whether assessed on an annual or other periodic basis.

---

property), Congress appears to have excluded such an expansive interpretation of the term.

"(5) Seller's points.

"(6) Interest forfeited as a result of an interest reduction required by law on a time deposit used as security for an extension of credit.

"(7) [Certain fees related to real estate.]

"(8) Discounts offered to induce payment for a purchase by cash, check, or other means, as provided in section 167(b) of the Act."  § 226.4(c) (emphasis added).

The Board adopted the regulation to emphasize "disclosures that are relevant to credit decisions, as opposed to disclosures related to events occurring after the initial credit choice," because "the primary goals of [TILA] are not particularly enhanced by regulatory provisions relating to changes in terms on outstanding obligations and on the effects of the failure to comply with the terms of the obligation."  45 Fed. Reg. 80649 (1980).  The Board's decision to emphasize disclosures that are most relevant to a consumer's initial credit decisions reflects an understanding that *"[m]eaningful* disclosure does not mean *more* disclosure," but instead "describes a balance between 'competing considerations of complete disclosure . . . and the need to avoid . . . [informational overload].'"  *Ford Motor Credit Co.,* 444 U. S., at 568 (quoting S. Rep. No. 96–73, p. 3 (1979)).  Although the fees excluded from the term "finance charge" in Regulation Z (*e. g.,* application charges, late payment charges, and over-limit fees) might be relevant to a consumer's credit decision, the Board rationally concluded that these fees—which are not automatically recurring or are imposed only when a consumer defaults on a credit agreement—are less relevant to determining the true cost of credit.  Because over-limit fees, which are imposed only when a consumer breaches the terms of his credit agreement, can reasonably be characterized as a penalty for defaulting on the credit agreement, the Board's decision to exclude them from the term "finance charge" is surely reasonable.

In holding that Regulation Z conflicts with § 1605's definition of the term "finance charge," the Court of Appeals ignored our warning that "judges ought to refrain from substituting their own interstitial lawmaking for that of the [Board]." *Ford Motor Credit Co., supra,* at 568. Despite the Board's rational decision to adopt a uniform rule excluding from the term "finance charge" *all* penalties imposed for exceeding the credit limit, the Court of Appeals adopted a case-by-case approach contingent on whether an act of default was "unilateral." Putting aside the lack of textual support for this approach, the Court of Appeals' approach would prove unworkable to creditors and, more importantly, lead to significant confusion for consumers. Under the Court of Appeals' rule, a consumer would be able to decipher if a charge is considered a "finance charge" or an "other charge" each month only by recalling the details of the particular transaction that caused the consumer to exceed his credit limit. In most cases, the consumer would not even know the relevant facts, which are contingent on the nature of the authorization given by the creditor to the merchant. Moreover, the distinction between "unilateral" acts of default and acts of default where a consumer exceeds his credit limit (but has not thereby renegotiated his credit limit and is still subject to the over-limit fee) is based on a fundamental misunderstanding of the workings of the credit card industry. As the Board explained below, a creditor's "authorization" of a particular point-of-sale transaction does not represent a final determination that a particular transaction is within a consumer's credit limit because the authorization system is not suited to identify instantaneously and accurately over-limit transactions. Brief for Board of Governors of Federal Reserve System as *Amicus Curiae* in No. 00–4213 (CA6), pp. 7–9.

Congress has authorized the Board to make "such classifications, differentiations, or other provisions, and [to] provide for such adjustments and exceptions for any class of transac-

tions, as in the judgment of the Board are necessary or proper to effectuate the purposes of [TILA], to prevent circumvention or evasion thereof, or to facilitate compliance therewith." § 1604(a). Here, the Board has accomplished all of these objectives by setting forth a clear, easy to apply (and easy to enforce) rule that highlights the charges the Board determined to be most relevant to a consumer's credit decisions. The judgment of the Court of Appeals is therefore reversed.

*It is so ordered.*