Filed: March 7, 2008

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 06-1720
(1:05-cv-01090-CMH-TC)

JAMES ALEXANDER CETTO, II; ELIZABETH ANN
CETTO,

                              Plaintiffs - Appellants,

          versus

LASALLE BANK NATIONAL ASSOCIATION, as Trustee
for Structured Asset Investment Loan Series
2003-BC9 by Wilshire Credit Corporation, its
Authorized Servicing Agent,

                              Defendant - Appellee,

          versus

SAVINGS FIRST MORTGAGE, LLC,

                              Party in Interest.

O R D E R

     The court amends its opinion filed February 29, 2008, as
follows:

     On page 4, line 15, the symbol "÷" is added in the
parenthetical between the numbers "$12,169" and "$153,378.71."

                              For the Court - By Direction

                                 /s/ Patricia S. Connor

                              Clerk

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JAMES ALEXANDER CETTO, II;
ELIZABETH ANN CETTO,
            *Plaintiffs-Appellants,*

v.

LASALLE BANK NATIONAL
ASSOCIATION, as Trustee for
Structured Asset Investment Loan
Series 2003-BC9 by Wilshire Credit
Corporation, its Authorized
Servicing Agent,
            *Defendant-Appellee,*

v.

SAVINGS FIRST MORTGAGE, LLC,
            *Party in Interest.*

No. 06-1720

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Senior District Judge.
(1:05-cv-01090-CMH-TC)

Argued: October 30, 2007

Decided: February 29, 2008

Before NIEMEYER, SHEDD, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Shedd and Judge Duncan joined.

**COUNSEL**

**ARGUED:** Thomas Ray Breeden, Manassas, Virginia, for Appellants. Paul Wilbur Jacobs, II, CHRISTIAN & BARTON, L.L.P., Richmond, Virginia, for Appellee. **ON BRIEF:** Nichole Buck Vanderslice, CHRISTIAN & BARTON, L.L.P., Richmond, Virginia, for Appellee.

---

**OPINION**

NIEMEYER, Circuit Judge:

James and Elizabeth Cetto seek to rescind the refinancing of their Virginia home based on their claim that the total points and fees charged in the transaction qualified the loan as what is commonly referred to as a "high-cost mortgage" under the Truth in Lending Act ("TILA") as amended by the Home Ownership and Equity Protection Act ("HOEPA"), which entitled them to specific disclosures and terms that they were not afforded.[1] A high-cost mortgage is one in which the "points and fees" exceed 8% of the "total loan amount." *See* 15 U.S.C. § 1602(aa)(1)(B)(i). To support their claim, the Cettos contend that title search and title binder fees charged by the settlement agent at closing, which are usually not includable as "points and fees," should be included in the calculation of "points and fees" in this case because (1) the settlement agent was affiliated with the mortgage broker on the transaction and (2) the mortgage broker in turn was a "creditor" on the loan, as they claim that term is defined in 15 U.S.C. § 1602(f). They argue that the mortgage broker was a "creditor" because the mortgage broker had served as a lender on previous occasions in unrelated transactions, thus falling within their definition of "creditor," which is based on their interpretation of the last sentence of § 1602(f).

---

[1]The purpose for enacting TILA and HOEPA was to provide economic stabilization in consumer credit lending by assuring meaningful disclosure of credit terms and thus permitting consumers to make an informed use of credit. *See* 15 U.S.C. § 1601(a).

It is undisputed by the parties that the settlement agent in this case was affiliated with the mortgage broker and that if the mortgage broker meets the definition of "creditor" in § 1602(f) and Regulation Z under it, the fees paid to the settlement agent for the title search and title binder would have to be included as part of the "points and fees" charged on the transaction, making the loan a high-cost mortgage.

We conclude, as did the district court, that the mortgage broker in this case was not a "creditor" as defined in § 1602(f), and therefore the title search and title binder fees paid to the settlement agent were not includable as part of the "points and fees" charged. Without the inclusion of the title search and title binder fees, the loan to the Cettos was not a "high-cost mortgage" and therefore did not require the additional disclosures and protections of TILA and HOEPA. Accordingly, we affirm the judgment of the district court.

I

Following a solicitation from Savings First Mortgage, LLC, James and Elizabeth Cetto decided to refinance their home in Dale City, Virginia, "so that [they could] cash out and have some money to do whatever [they] needed to do in [Mr. Cetto's] business and at home." Savings First, functioning as a mortgage broker, obtained a 30-year adjustable interest rate loan for the Cettos from MorEquity, Inc., at an initial interest rate of 5.85%, subject to adjustments thereafter based on market conditions. Savings First charged the Cettos $7,400 for broker and processing fees.

Through the refinancing transaction, which closed on April 8, 2003, the Cettos borrowed $166,000, with which they paid off their previous mortgage and debts recorded against their house, as well as the costs and fees of the refinancing. They then took the balance in cash. With the cash, they fixed up their house, paid some bills, and took a vacation.

Settlement of the new loan was conducted by Accurate Settlement Services, Inc., an "affiliate" of Savings First, as defined by 12 U.S.C. § 1841(k). The settlement sheet, which the Cettos signed and dated at the closing on April 8, 2003, discloses that from the $166,000 proceeds of the loan, the Cettos paid:

(1)   the prior mortgage and other debts recorded against their house in the amount of $103,191.52;

(2)   amounts charged by third parties for appraisal, a title search and title binder, insurance, tax stamps, and property taxes, in the total amount of $3,226.83;

(3)   prepaid finance charges of $12,169 (including a loan discount, mortgage broker and processing fees, mortgage underwriting and administration fees, flood certification fee, and release fee); and

(4)   interest for 17 days, in the amount of $452.29.

The $46,960.36 balance was paid to the Cettos. The settlement sheet discloses, as significant to TILA and HOEPA, that the "total loan amount" as defined by statute was $153,378.71 and that the "points and fees" as defined by statute were $12,169. The cost of the loan therefore was 7.93% ($12,169 ÷ $153,378.71), rendering the loan not a high-cost mortgage because the "points and fees" were not greater than 8% of the amount financed. *See* 15 U.S.C. § 1602(aa)(1)(B)(i).

About three months after the refinancing closed, on July 1, 2003, MorEquity sold the loan and mortgage to Lehman Brothers as part of a package of 286 loans bundled for investment purposes, denominated as "Structured Asset Investment Loan Series 2003-BC9," and LaSalle Bank National Association was appointed the trustee of the bundled asset. For purposes of the Cettos' claims in this case, LaSalle Bank stands in the place of MorEquity, the original lender. *See* 15 U.S.C. § 1641(d)(1).

The refinancing increased the Cettos' monthly payment on their home from $866 per month to $1,199 per month (including real estate taxes and insurance), which the Cettos found stressful. Mr. Cetto said he knew his monthly payment would go up, but he did not know that it would be that much. In addition, after reviewing the closing costs, Mr. Cetto observed that they were unexpectedly high. As he testified in deposition, "After [the three-day cancellation period had elapsed when he reviewed the loan papers] I noticed, you know, wow, this is high."

By letters dated September 14 and 17, 2004, some 17 months after closing, addressed to the servicing agent for the bundled loans asset, Mr. Cetto stated that he was rescinding the refinancing transaction, claiming violations of TILA, HOEPA, and the Real Estate Settlement Procedures Act, as well as "other consumer protection statutes." When his demand for rescission was rejected on the basis that the Cettos' loan did not qualify for the more generous rescission provision of HOEPA, the Cettos commenced this action against LaSalle Bank, as assignee of the loan and mortgage.

In their complaint, the Cettos alleged that the $166,000 refinancing loan was a high-cost mortgage, as defined by 15 U.S.C. § 1602(aa)(1)(B)(i), because, according to their calculation, the total "points and fees" exceeded 8% of the total loan amount. To support their claim that the loan cost them more in "points and fees" than 8%, they included as "points and fees" $1,274.48 paid to Accurate Settlement, the settlement agent, for its title search and title binder. They claimed, therefore, that federal law entitles them to disclosures and terms that were not provided. Based on these violations, they alleged that they are entitled to rescission, statutory damages and other damages, attorneys fees, and costs.

LaSalle Bank denied that the settlement agent's fees were properly includable as "points and fees" to determine whether the transaction qualified as a high-cost mortgage, and it also filed a cross-claim for $188,669.44, plus interest, attorneys fees, and costs, alleging that the Cettos failed to make payments on the loan since August 11, 2004, and that the loan therefore is in default.

On cross-motions for summary judgment, the district court denied the Cettos' motion and granted LaSalle Bank's motion. The court concluded that Savings First was not a "creditor" on the transaction but rather acted only as the mortgage broker in that it did not lend any money to the Cettos. Therefore the fees paid to Accurate Settlement, an affiliate of Savings First, for its title search and title binder were not "points and fees" charged by a "creditor" or one affiliated with a "creditor." From the district court's judgment dated June 1, 2006, the Cettos filed this appeal.

The only issue raised on appeal is whether, under TILA and HOEPA, the definition of "creditor," as set forth in 15 U.S.C.

§ 1602(f), includes a person who acted only as a mortgage broker in the particular transaction, but who had acted as a lender in the past for unrelated transactions. This issue, which requires a construction of § 1602(f), is one of first impression.

II

In greater particularity, the Cettos seek rescission of their refinancing loan and damages because of various violations of TILA and HOEPA, which require a lender to make certain disclosures and prohibit certain loan terms if the loan qualifies as what is commonly referred to as a high-cost mortgage. A loan is a high-cost mortgage when "the total points and fees payable by the consumer at or before closing" exceed "8 percent of the total loan amount." 15 U.S.C. § 1602(aa)(1)(B)(i). The Cettos maintain that the points and fees calculation for their loan failed to include $1,274.48 paid to Accurate Settlement for the title search and title binder. When those charges are included as costs, the points and fees paid by the Cettos exceed 8%, triggering the additional protections that HOEPA added when it amended TILA.

The Cettos' claim, therefore, depends on whether the title search and title binder fees paid to Accurate Settlement at closing were properly excluded from the calculation of "points and fees" in determining whether their loan was a high-cost mortgage. If those fees were properly excluded, the total points and fees charged were lower than 8% of the total loan amount; but if those fees are includable, then the points and fees exceed 8% and the Cettos would be entitled to relief.

The facts are not in dispute, and the question reduces to one of statutory interpretation, which we review *de novo*. *See Holland v. Pardee Coal Co.*, 269 F.3d 424, 430 (4th Cir. 2001).

Under HOEPA, the threshold for the high-cost mortgage protections is determined by dividing the total points and fees payable by the consumer by the total loan amount to determine whether that ratio exceeds 8%. "Total points and fees" on a mortgage means:

    (A)   all items included in the finance charge, except interest or the time-price differential;

(B)   all compensation paid to mortgage brokers;

(C)   *each of the charges listed in section 1605(e) of this title* (except an escrow for future payment of taxes), *unless —*

     (i)   the charge is reasonable;

     (ii)   the creditor receives no direct or indirect compensation; and

     (iii)   *the charge is paid to a third party unaffiliated with the creditor*; and

(D)   such other charges as the Board determines to be appropriate.

15 U.S.C. § 1602(aa)(4) (emphasis added). Section 1605(e), in turn, lists the following fees:

(1)   *Fees or premiums for title examination, title insurance, or similar purposes*.

(2)   Fees for preparation of loan-related documents.

(3)   Escrows for future payments of taxes and insurance.

(4)   Fees for notarizing deeds and other documents.

(5)   Appraisal fees, including fees related to any pest infestation or flood hazard inspections conducted prior to closing.

(6)   Credit reports.

15 U.S.C. § 1605(e) (emphasis added). Accordingly, fees for title searches and title binders are not included in the calculation of "points and fees" unless they are unreasonable, the creditor receives direct or indirect compensation in respect to them, or the third party to whom the fees are paid is *affiliated with the creditor*.

In this case, the parties agree that if the $1,274.48 in fees paid to Accurate Settlement are included in the calculation of "points and fees payable by the consumer," the cost of the Cettos' loan would exceed 8% of the total loan amount. The Cettos argue that the fees paid to Accurate Settlement should be included because Accurate Settlement was affiliated with "the creditor," namely Savings First. La-Salle Bank agrees that Accurate Settlement is affiliated with Savings First, but it contends that Savings First was not "the creditor," as required by the statute. The statute includes title search and binder fees only if Accurate Settlement was affiliated "with the creditor." *See* 15 U.S.C. § 1602(aa)(4)(C)(iii).

The issue thus reduces to the question of whether Savings First was "the creditor" on the refinancing transaction. If it was, then the Cettos properly claim that fees paid to an affiliate of Savings First must be included in the points and fees charged to the Cettos.

The TILA, as amended by HOEPA, defines "creditor" as follows:

> *The term "creditor" refers only to a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.* Notwithstanding the preceding sentence, in the case of an open-end credit plan involving a credit card, the card issuer and any person who honors the credit card and offers a discount which is a finance charge are creditors. For the purpose of the requirements imposed under part D of this subchapter and sections 1637(a)(5), 1637(a)(6), 1637(a)(7), 1637(b)(1), 1637(b)(2), 1637(b)(3), 1637(b)(8), and 1637(b)(10) of this title, the term "creditor" shall also include card issuers whether or not the amount due is payable by agreement in more than four installments or the payment of a finance charge is or may be required, and the Board shall, by regulation, apply these requirements to such card issuers, to the extent appropriate,

even though the requirements are by their terms applicable only to creditors offering open-end credit plans. *Any person who originates 2 or more mortgages referred to in subsection (aa) of this section in any 12-month period or any person who originates 1 or more such mortgages through a mortgage broker shall be considered to be a creditor for purposes of this subchapter.*

15 U.S.C. § 1602(f) (emphasis added). It is undisputed that Savings First is not a "creditor" according to § 1602(f)'s *first* sentence, because Savings First is not "the person to whom the debt arising from [the loan] is initially payable" on the face of the loan documents. The transaction documents show that the Cettos' loan was initially payable to MorEquity, not Savings First. The Cettos argue, however, that the *last* sentence of § 1602(f) provides a stand-alone *alternative* definition of "creditor," under which Savings First qualifies because it originated two or more high-cost mortgages in a 12-month period, albeit not the mortgage in this case. They maintain that because Savings First originated unrelated high-cost loans to other borrowers in the past, Savings First, even though only acting as the mortgage broker in this transaction, should be considered a "creditor" for *all* of its transactions, including this one.

The language of the first sentence of § 1602(f) is unambiguous in defining "creditor" to refer "*only* to a person who *both* (1) regularly extends . . . consumer credit . . . *and* (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness . . . ." 15 U.S.C. § 1602(f) (emphasis added). The definition given in this sentence is restrictive and precise, referring *only* to a person who satisfies *both* requirements. Thus, even if an institution were to extend consumer credit regularly — however "regularly" might be defined — it still would not be a "creditor" under the first sentence of § 1602(f) unless it was also the one to which the debt was initially payable. Because a mortgage broker is not one to whom the initial debt is payable, neither it nor its affiliates are "creditors" under this definition. Fees paid to the mortgage broker's affiliates for title search and binders would accordingly not be included in the calculation of total "points and fees." *See* 15 U.S.C. § 1602(aa)(4); *id.* § 1605(e).

The last sentence of § 1602(f), which the Cettos contend provides an alternative stand-alone definition of "creditor," refers only to a person who has originated two or more high-cost mortgages in a 12-month period or one such mortgage if through a mortgage broker. If the Cettos are correct in their construction, the last sentence would so extend the class of "creditors" as effectively to include any participant in a loan transaction who has ever made one or two high-cost loans in the past, eliminating the requirement for that person that it be the one to whom the debt in the given transaction is initially payable. Such a construction would not only broaden the definition of "creditor" to unworkable limits, but it would also make an arbitrary distinction between persons, based on irrelevant aspects of their lending history. Thus, in any given transaction, a mortgage broker lending no money in the transaction but who had previously made a thousand loans in which the costs were no more than 8.0% of the loan amount would *not* be a "creditor," but a mortgage broker who had previously made two loans in which the costs were 8.1% of the loan amount *would* be a "creditor," *regardless of whether it was lending any money in the current transaction*. But the statutory language does not support the Cettos' construction.

*First*, because the first sentence of § 1602(f) *requires* that *both* elements of the two-part test be met for determinations of "creditor" status, we should not automatically construe the last sentence of § 1602(f) to override either part of the first sentence by implication. To avoid this result, the last sentence must be read to provide additional particularization to the first sentence, clarifying when a person extending a high-cost mortgage "regularly extends" credit such that he is "considered to be a creditor for purposes of this subchapter."

*Second*, the last sentence cannot stand alone from the first because alone, it has no tie to any extension of credit in the current transaction. *Any* person in the current transaction would be a creditor so long as during some 12-month period in its business history it extended two high-cost mortgages. The only way to give the content of § 1602(f) a coherent meaning is to take the last sentence as dealing with the *frequency* with which a person extends installment credit to become one who "regularly extends" credit, as that phrase is used in the first sentence.

*Third*, the last sentence speaks of "any person who originates 1 or more [high-cost] mortgages *through a mortgage broker*," manifesting the clear understanding that "a mortgage broker" in a transaction is someone distinct from "the creditor." *See* 15 U.S.C. § 1602(f) (emphasis added). Maintaining this distinction is confirmed elsewhere in the statute as Congress included in the points and fees calculation "all compensation paid to mortgage brokers," *see* 15 U.S.C. § 1602(aa)(4), making no mention of compensation paid to the brokers' *affiliates*, even though it clearly contemplated and included fees paid to affiliates of *the creditor*. In arguing that the last sentence provides an alternative, stand-alone definition of "creditor" that includes mortgage brokers who have in the past extended credit, the Cettos have failed to address this language in § 1602(aa)(4) that clearly includes the fees of "mortgage brokers" and the fees of affiliates of creditors, while making no mention of the fees paid to *affiliates* of mortgage brokers. Had it been Congress' intent, that section could have included fees "paid to mortgage brokers *and their affiliates*." But it did not. Thus, Congress continued its distinction between mortgage brokers and creditors and their respective duties and responsibilities based on their roles in the particular transaction.

*Fourth*, the last sentence speaks of "any person who *originates* 1 or more [high-cost] mortgages," (emphasis added), again distinguishing from a mortgage broker. The *originator* of a mortgage is not the mortgage broker in the transaction because Congress would not have used different terms to describe a single entity. Indeed, the one who "originates" a mortgage is the same entity to whom the debt "is initially payable," as referred to in the first sentence.

*Fifth*, the Cettos' argument that because the second and third sentences of § 1602(f) create stand-alone definitions of "creditor," the fourth sentence should also be treated as a stand-alone definition fails to take into account the historical facts. The first three sentences were stand-alone definitions in the pre-HOEPA version of TILA. HOEPA, which added protections in circumstances when the creditor originates a high-cost mortgage, added the last sentence of § 1602(f) as a patch to extend the first-sentence definition of "creditor" in the context of mortgages to include persons who have originated only two prior high-cost mortgages.

When enacting HOEPA in 1994 as amendments to TILA, Congress amended the definition of creditor by adding the last sentence of § 1602(f). Home Ownership and Equity Protection Act, Pub. L. No. 103-325, § 152(c), 108 Stat. 2160, 2191 (1994). The Senate Report explained the addition of that sentence as follows:

> The current definition of creditor in Truth-in-Lending excludes those who originate four or fewer mortgages per year.[2] For High Cost Mortgages, the Committee has extended coverage to anyone making a high cost mortgage through a broker and anyone who makes more than one High Cost Mortgage in a twelve month period. The Committee seeks to prevent brokers from evading the legislation by matching each borrower with a different private individual acting as a lender.

S. Rep. No. 103-169, at 25 (1993) *as reprinted in* 1994 U.S.C.C.A.N. 1881, 1909. Thus, Congress was concerned with persons who were evading the law by arranging high-cost loans through individual investors who did not "regularly extend" credit as it was defined in Regulation Z at the time. These individuals would serve as the lender for only one or two mortgages, and so did not qualify as "creditors" by the terms of § 1602(f)'s first sentence and Regulation Z's definition of "regularly extend[ing]" credit, which required more than five previous extensions of credit through mortgages. With no "creditor" in these transactions, TILA would not apply at all. The 1994 amendment, thus, was designed to reach such persons who arranged for a group of smaller, less frequent investors to serve as lenders for high-

---

[2]Here, Congress refers to Regulation Z's numerical requirements for determining when a lender "regularly extends consumer credit." These numerical requirements were established in the Regulation in the 1980s, after a decade under TILA in which courts had little guidance as to what was meant by the phrase. Although Congress refers to "those who originate four or fewer" mortgages as being wholly exempt from the definition of creditor under TILA, Regulation Z actually states that a person is a creditor only if he extended credit "more than 5 times" for transactions secured by a dwelling, not "5 or more," as the Senate report erroneously reads Regulation Z. *See* 12 C.F.R. § 226.2(a)(17) n.3. The discrepancy, however, is not material to the discussion here.

cost mortgages, thereby avoiding the requirements of TILA simply because they did not "regularly extend" consumer credit as it was then defined. With the new language, the person making a high-cost mortgage loan becomes a "creditor" for future transactions in which he extends credit even if he originated just two high-cost loans in 12 months or even a single high-cost loan through a mortgage broker. *See* 15 U.S.C. § 1602(f).

In light of this history, nothing can be gained from blindly viewing the structure of § 1602(f) alone, as the Cettos suggest.

*Sixth*, the Cettos' structural argument that because the first three sentences are stand-alone definitions, so must the last sentence be a stand-alone definition also fails to consider the *substance* of each of the sentences. The first sentence defines "creditor" for *installment* loans involving both personal property and real property. The second and third sentences define "creditor" in the credit card context to include a merchant who honors the credit card and the issuer of the card. Credit card loans, unlike the loans addressed in the first sentence, are not installment loans (indeed, many borrowers pay off their debt in one payment). The fourth and last sentence returns to the subject of the first, addressing creditors in the context of *installment* loans involving property. The first and last sentences thus are linked by their substantive content.

*Finally*, we believe that a less awkward and surely a less problematic reading, indeed the more natural reading of the entire subsection — one that construes the first and last sentences in harmony with each other — would take the last sentence to define with more particularity when a person who is making a high-cost installment loan "regularly extends" credit, as that phrase appears in the first sentence.

In sum, the universal definition of "creditor" in the first sentence of § 1602(f), the substantive and linguistic connections between the first and last sentences, the differential terminology between "creditor" and "mortgage broker," the history of the last sentence's enactment, and common sense directs us to conclude that the last sentence is not a stand-alone definition, as argued by the Cettos, but rather a particularizing clarification of the first sentence, which defines "credi-

tor" in an installment loan as the person to whom the obligation is initially payable.

## III

In addition to the unambiguous statutory language of TILA and HOEPA, Regulation Z, promulgated by the Federal Reserve Board to assist in applying § 1602(f), provides that "creditor" cannot include a mortgage broker who does not extend credit in the transaction and that the last sentence of § 1602(f) explains the first prong of the "creditor" definition in the first sentence — what it means to "regularly extend" credit — in circumstances when high-cost mortgages are involved. Regulation Z defines creditor as:

> (i) A person (A) who regularly extends consumer credit[3] that is subject to a finance charge or is payable by written agreement in more than 4 installments (not including a downpayment), and (B) to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract.

> *FN3*:   A person regularly extends consumer credit only if it extended credit (other than credit subject to the requirements of § 226.32 [high-cost mortgages]) more than 25 times (or more than 5 times for transactions secured by a dwelling) in the preceding calendar year. If a person did not meet these numerical standards in the preceding calendar year, the numerical standards shall be applied to the current calendar year. *A person regularly extends consumer credit if, in any 12-month period, the person originates more than one credit extension that is subject to the requirements of § 226.32 [high-cost mortgages] or one or more such credit extensions through a mortgage broker.*

12 C.F.R. § 226.2(a)(17)(i) (emphasis added). Footnote 3 of Regulation Z states that the last sentence of § 1602(f) refers to and further defines part (1) of the first sentence as to who "regularly extends" credit. Thus, a person "regularly extends" credit as used in part (1) of the first sentence of § 1602(f) when he has extended credit through mortgages more than five times in the previous year *or* when he has

made more than one high-cost mortgage previously (or just one, if through a mortgage broker), as provided in the last sentence of § 1602(f).

Regulation Z thus confirms that the last sentence does not operate as a stand-alone definition. Instead, the Regulation creates a two-tiered structure to define a person who "regularly extends consumer credit" in the mortgage context. On one level it defines "regularly" as any person who has extended credit through more than five mortgages (whether high-cost or not) in the preceding calendar year, and on the other level it defines "regularly" as any person who has extended credit through more than one high-cost mortgage (or one, if through a mortgage broker) in any 12-month period. To be a "creditor," however, the person must *also* always fulfill the *second* prong of Regulation Z's definition (which tracks exactly the statutory definition in the first sentence of 15 U.S.C. § 1602(f)) by being the one to whom the obligation is initially payable on the face of the loan document. Because the mortgage broker in a transaction is not the one to whom the debt is initially payable, even if the broker extended credit on any number of previous, unrelated transactions, it is not a "creditor" for that particular transaction.

Based on both § 1602(f) and Regulation Z promulgated under it, we hold that Savings First was not a "creditor" in the Cettos' refinancing transaction, and thus we affirm the district court's judgment reaching this same conclusion.[3]

---

[3]Although no other court of appeals has yet found it necessary to construe the last sentence of § 1602(f), lower courts have done so, mostly rejecting the position taken by the Cettos. *See Viernes v. Executive Mortgage, Inc.*, 372 F. Supp. 2d 576, 582 (D. Haw. 2004) (finding that the last sentence of 15 U.S.C. § 1602(f) does not create an independent definition of "creditor" under TILA); *Wilson v. Bel Fury Investments Group, LLC*, 2006 U.S. Dist. LEXIS 35740, *9-13 (D. Neb., Feb. 6, 2006) (finding that the final sentence of § 1602(f) is not a stand-alone definition of creditor but simply expands on the definition to explain who "regularly extends" consumer credit). *But see Anderson v. Wells Fargo Home Mortgage, Inc.*, 259 F. Supp. 2d 1143, 1149 (W.D. Wash. 2003) (stating, without referring to Regulation Z, that the final sentence of § 1602(f) is a stand-alone definition of "creditor" but not relying on this statement in the holding of the case).

IV

Unable to provide any argument why Regulation Z does not dictate the outcome of this case, the Cettos contend that Regulation Z itself is invalid because it contradicts what they see as the "unambiguous" meaning of § 1602(f) — that it contains a free-standing definition of "creditor" in the last sentence.

To address the Cettos' attack on Regulation Z, we must assess the regulation under the familiar two-step framework set out in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984), because Regulation Z resulted from the exercise of the Federal Reserve Board's congressionally delegated authority to enact regulations that carry legal force. *See* 15 U.S.C. § 1604; *Household Credit Servs., Inc. v. Pfenning*, 541 U.S. 232, 238-39 (2004) (applying *Chevron* to Regulation Z). Indeed, the Supreme Court has observed that "Congress has specifically designated the Federal Reserve Board and staff as the primary source for interpretation and application of truth-in-lending law." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980). The Court in *Milhollin* stated, "[b]ecause creditors need sure guidance through the 'highly technical' Truth in Lending Act, legislators have twice acted to promote reliance upon Federal Reserve pronouncements." *Id.* at 566 (citation omitted). *First*, Congress provided a good-faith defense to creditors who comply with the Board's rules and regulations, as set forth in 15 U.S.C. § 1640(f); and *second*, it expanded this good-faith defense to creditors

---

Several other courts have refused to deem mortgage brokers to be "creditors," but there is no evidence in their opinions that they considered past extensions of credit by the brokers that would fall within Regulation Z, and the courts did not explicitly address § 1602(f)'s last sentence. *See Robey-Harcourt v. Bencorp Financial Inc.*, 326 F.3d 1140, 1142-43 (10th Cir. 2003); *Wilson v. Homecomings Financial Network, Inc.*, 407 F. Supp. 2d 893, 896 (N.D. Ohio 2005); *Noel v. Fleet*, 971 F. Supp. 1102, 1109 (E.D. Mich. 1997); *Sweeney v. Savings First Mortgage, LLC*, 879 A.2d 1037, 1046-48 (Md. 2005) (finding that "[o]ne thing is certain, mortgage brokers are not included in the definition of 'creditor' under the TILA" and therefore holding that TILA does not preempt state laws that regulate mortgage brokers).

who conform to "any interpretation or approval by an official or employee of the Federal Reserve System duly authorized by the Board to issue such interpretations or approvals." 15 U.S.C. § 1640(f); *Milhollin*, 444 U.S. at 566-67. Thus, under specifically applicable statutory provisions and Supreme Court holdings, we must accord strong deference to Regulation Z.

The Cettos can succeed under the *Chevron* analysis only if they can demonstrate that the text of the statute is unambiguous in favor of their construction, in which case we would have to apply it as written, regardless of what the agency regulation provides. *See Chevron*, 467 U.S. at 842-43; *see also Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 476 (1992); *cf. Milhollin*, 444 U.S. at 566-67 n.9. Thus they argue that because the last sentence of § 1602(f) does not *explicitly* define a person who "regularly extends consumer credit" described in part (1) of the first sentence, the last sentence must therefore be a stand-alone definition of "creditor." They argue that this construction is unambiguous and, accordingly, that the Federal Reserve Board's construction of § 1602(f) in Regulation Z is an impermissible one. *See Chevron*, 467 U.S. at 843.

Inasmuch as we rejected the Cettos' construction of § 1602(f) in Part II, above, by drawing on a common sense reading of the language used in the statute itself as well as the statutory structure that distinguishes between mortgage brokers and creditors, we cannot agree that the Cettos' contrary construction is unambiguously correct and that Regulation Z therefore is an impermissible construction of § 1602(f) because it is inconsistent with the Cettos' construction.

But even if we restrict our focus to the last sentence of § 1602(f) and the absence of explicit language indicating that the purpose of the sentence is to modify further the first sentence, as the Cettos urge, we could assume at most the existence of a technical gap or ambiguity as to whether the last sentence modifies the first. Assuming that were so, we would then determine, under *Chevron*'s second step, whether Regulation Z is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. In doing so, we would not need to conclude that "the agency construction [is] the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial

proceeding." *Id.* at 843 n.11. Moreover, because a construction is permissible if it is reasonable, we would not be entitled "[to] substitute [our] own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844.

On the assumption of a technical gap or ambiguity in the statute, we nonetheless conclude that Regulation Z is a reasonable construction of the statute.

Looking through the inquiring lens of reasonableness, we conclude that Regulation Z's interpretation — that the last sentence of § 1602(f) modifies the first sentence of that section — makes complete sense. As we have already pointed out, the first sentence defines a "creditor" as "*only* . . . a person" (1) who "regularly extends" credit "*and*" (2) who is the person to whom the debt in the given transaction is initially payable. The two requirements are mandatory and without exception. Moreover, they make sense when reading a statute that imposes disclosure requirements on *the creditor in a given transaction*, because it is the creditor who lends the money in the transaction.

If one of the two requirements for defining a creditor in the first sentence is eliminated by treating the last sentence as an independent definition, the consequences are significant and, indeed, unreasonable. *First*, the first sentence and the last sentence would have created an arbitrary distinction regarding whether a transaction's broker is a creditor or not, without logic or reason. One mortgage broker, who is not a lender in the current transaction, is deemed a "creditor" because it made two loans in its history having costs exceeding 8%, and another mortgage broker, who likewise is not a lender in the current transaction, is excluded from the definition of "creditor" only because all of its prior loans — no matter how many — had costs of 8% or less. *Second*, mortgage brokers in a transaction would be regulated the same as creditors, even though they extended no credit to the consumer and even though the statute refers to mortgage brokers as persons distinct from creditors. *Third*, the absurdity of such a construction would be that the TILA and HOEPA would regulate mortgage brokers as creditors, not because the mortgage brokers extended any credit to the consumer, but because they had at some time in the past extended credit as a lender. Common sense suggests that TILA and HOEPA were enacted to protect consumers from credi-

tors in specific consumer loans, not from non-lenders who may have served as creditors in some other transaction years before.

Avoiding these consequences, Regulation Z reads the first and last sentences of § 1602(f) in a natural way that lets them stand in harmony.

Accordingly, we conclude that the Federal Reserve Board's interpretation of "creditor" in Regulation Z is, if not the correct one, certainly a permissible one. *First*, as shown above, it is a logical interpretation and fits into one of two possible interpretations of the statute based on the plain meaning of the text. *Second*, the clause in the last sentence of § 1602(f), making a creditor out of "any person who *originates* 1 or more [high-cost] mortgages through a *mortgage broker*," suggests that the mortgage broker is a person other than the "creditor" in a mortgage transaction. *See* 15 U.S.C. § 1602(f) (emphasis added). *Finally*, it conforms to common sense. It would be strange for a mortgage broker that merely arranged a particular loan to be considered a "creditor" for the entire subchapter, 15 U.S.C. §§ 1601-77 (Consumer Credit Cost Disclosure), just because it had originated a mortgage and extended credit in some earlier, unrelated transaction. Thus, the Federal Reserve Board's interpretation — using the last sentence of § 1602(f) to define further what is meant by "regularly extend[ing]" consumer credit — is a reasonable and therefore permissible construction of the statute.

V

As a final attempt to attack the validity of Regulation Z, the Cettos contend that the Federal Reserve Board's official staff interpretation of Regulation Z contradicts the Regulation's obvious meaning. The inference to be drawn is that either the position taken in Regulation Z or the position taken by the staff is an unreasonable construction and therefore neither can be accorded deference as reasonable. *See Milhollin*, 444 U.S. at 565 ("Unless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive . . . ."); *see also* 15 U.S.C. § 1640(f) (good faith compliance with a Board staff opinion is a shield to liability under certain sections of TILA and HOEPA).

The relevant staff interpretation notes that "[t]he *definition* [of creditor] contains four independent tests. If any one of the tests is met, the person is a creditor for purposes of that particular test." 12 C.F.R. § 226, Supp. I, at 374 (emphasis added). The Cettos argue that this statement refers to the *statutory* definition of "creditor" located in 15 U.S.C. § 1602(f). Because there are four sentences in § 1602(f), the Cettos reason that each sentence must therefore amount to an individual definition of "creditor" and therefore that the staff interpretation supports their view that the last sentence of § 1602(f) is a free-standing definition — the "fourth definition" under the staff interpretation.

The Cettos' understanding of the Federal Reserve Board's staff interpretation is patently wrong. The staff interpretation refers to *Regulation Z*'s definition of "creditor," located in 12 C.F.R. § 226.2(a)(17), not to the *statutory* definition, located in 15 U.S.C. § 1602(f). Indeed the introduction to the Board's staff interpretation states: "This commentary is the vehicle by which the staff of the Division of Consumer and Community Affairs of the Federal Reserve Board issues official staff interpretations *of Regulation Z* . . . ." 12 C.F.R. § 226, Supp. I, at 368 (emphasis added).

Regulation Z's definition of "creditor" does indeed contain four independent tests, the first reciting the two-part test explained in the first sentence of 15 U.S.C. § 1602(f) and interpreting the last sentence of § 1602(f) to describe what it means to "regularly extend consumer credit" when a high-cost mortgage is involved. *See* 12 C.F.R. § 226.2(a)(17)(i). The three additional definitions in Regulation Z deal with various methods of becoming a "creditor" by extending credit through the issuance and acceptance of credit cards. *See* 12 C.F.R. § 226.2(a)(17)(ii)-(iv). In neither Regulation Z nor the staff interpretation is there any stand-alone definition of "creditor" conforming to § 1602(f)'s last sentence. Regulation Z's definition makes clear that, in this context, a creditor must be one to whom the debt is initially owed. Thus, the official staff position, which is consistent with Regulation Z, actually undermines rather than advances the Cettos' position. Moreover, it confirms further our understanding that the final sentence of § 1602(f) must be read to explain what it means to "regularly extend" consumer credit, as that phrase appears in the first sentence.

Because the Federal Reserve Board, through both Regulation Z and its staff interpretation, provides a consistent, rational, and therefore permissible explanation of the definition of "creditor" in § 1602(f), we are not free to ignore the construction made by the agency tasked with providing guidance on the statute.

VI

Were we to construe § 1602(f) to make any mortgage broker a "creditor," simply because the mortgage broker on a few occasions earlier was a creditor in unrelated transactions, we would broaden significantly the duties imposed on persons participating in loan transactions, with untold and unknown consequences that cannot now be fully foreseen. The TILA as amended by HOEPA is a detailed and complex statute concerned with balancing the benefits of disclosure requirements with the burdens that such disclosure would impose on various parties to credit transactions. To expand the disclosure requirements to persons who are not clearly creditors would be antithetical to the clear, permissible, and authoritative interpretation given by the agency experts in this area and would introduce undefinable instability to an area in which Congress sought to introduce stability. In addition, denying Savings First the ability to rely on the Board's permissible Regulation Z would lead to widespread confusion. Mortgage brokers would be unsure of their status under lending laws and would be punished for relying on the very regulations on which they have been encouraged by Congress in the statute to rely. *See, e.g.*, 15 U.S.C. § 1640(f); *Milhollin*, 444 U.S. at 566-67. Regulation Z provided the necessary "sure guidance" through the "highly technical" mortgage lending laws, *see id.* at 566, and Savings First relied on this recognized guidance.

Therefore, we hold that the definition of "creditor" in § 1602(f), based on traditional notions of statutory construction, the Federal Reserve Board's Regulation Z, and common sense, does not reach mortgage brokers in transactions in which they act only in the role of broker, even though they may have acted as a statutorily-defined "creditor" in prior unrelated transactions.

The judgment of the district court is

*AFFIRMED*.