PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JANICE SCHAFER, Guardian Ad
Litem for WMS, infant,
　　　　　　　*Plaintiff-Appellant,*

v.

MICHAEL J. ASTRUE,
　　　　　　　*Defendant-Appellee.*

No. 10-1500

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, Senior District Judge.
(3:09-cv-00096-GCM-DSC)

Argued: January 28, 2011

Decided: April 12, 2011

Before WILKINSON, AGEE, and DAVIS, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the
majority opinion, in which Judge Agee joined. Judge Davis
wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** Kelsi Brown Corkran, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Appel-
lee. **ON BRIEF:** George L. Fitzgerald, Charlotte, North Caro-

lina, for Appellant. Tony West, Assistant Attorney General, William Kanter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Anne M. Tompkins, United States Attorney, Charlotte, North Carolina; David Black, General Counsel, Karen Aviles, General Attorney, SOCIAL SECURITY ADMINISTRATION, Baltimore, Maryland, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

Don and Janice Schafer married in 1992. Don died the next year. With the help of in vitro fertilization, however, Janice gave birth to W.M.S., Don Schafer's biological child, a number of years later. Janice Schafer then applied on W.M.S.'s behalf for survivorship benefits under the Social Security Act. *See* 42 U.S.C. § 402(d) *et seq.*

The Social Security Administration rejected W.M.S.'s claim. Because under its view natural children must be able to inherit from the decedent under state intestacy law or satisfy certain exceptions to that requirement in order to count as "children" under the Act, W.M.S. was not eligible for survivorship benefits. *See* 42 U.S.C. §§ 416(h)(2), (h)(3)(C). The district court agreed. On appeal, Schafer contends that undisputed natural children such as W.M.S. plainly fall within 42 U.S.C. § 416(e)(1)'s basic definition of "child," making their state intestacy rights irrelevant.

We shall affirm the judgment. The agency's view best reflects the statute's text, structure, and aim of providing benefits primarily to those who unexpectedly lose a wage earner's support. And even if the agency's interpretation were not the only reasonable one, it falls well within the range of permissible readings entitled to deference under *Chevron U.S.A.*

*Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

I.

The sad facts giving rise to this case are not in real dispute. Janice and Don Schafer, Jr. were married in June 1992. Four months later he was diagnosed with cancer and informed that the chemotherapy he needed might render him sterile. In December 1992 he deposited sperm samples with a long-term storage facility, but in March 1993 he died of a heart attack. At the time Don was domiciled in Virginia.

In April 1999 Janice Schafer conceived a child through in vitro fertilization, and she gave birth to that child, W.M.S., on January 13, 2000 in Texas.[1] There is significant evidence that W.M.S. is Don Schafer's biological child, born almost seven years after Don's death. There is also evidence that Don intended for Janice to use the stored semen to conceive a child after his anticipated death, though he never expressed consent in writing to be the legal father of a child resulting from posthumous in vitro fertilization. In 2001 a Texas court purported to declare Don Schafer W.M.S.'s father.

In 2004 Janice Schafer applied on W.M.S.'s behalf to the Social Security Administration ("SSA") for surviving child benefits under the Social Security Act ("the Act"), *see* 42 U.S.C. § 402(d). An administrative law judge initially awarded W.M.S. benefits, but the SSA's Appeals Council reversed, reasoning that W.M.S. was not Don Schafer's "child" within the meaning of the Act because W.M.S. could

---

[1]Although the parties refer to W.M.S. as being conceived through artificial insemination in their briefs, claimant's application for benefits states that he was conceived through in vitro fertilization. While the two procedures are medically distinct, the specific type of assistive reproductive technology utilized is immaterial to our analysis in this case. We therefore use the terminology from the application.

not inherit from him under Virginia intestacy law. Janice Schafer then sought review of the SSA's decision in federal district court, which upheld the SSA's denial of benefits. She now appeals.

## II.

### A.

Every child claiming survivorship benefits under the Act must meet a series of requirements. Initially, the child or his guardian must have filed an application. 42 U.S.C. § 402(d)(1)(A). The child must also fit certain substantive criteria: he must be unmarried and either under certain age limits or subject to a disability, *id.* § 402(d)(1)(B), and he must have been "dependent upon such individual . . . at the time of such [individual's] death . . . ," *id.* § 402(d)(1)(C)(ii) (internal subsection division omitted).[2]

Before even reaching these questions, however, an applicant must establish something more fundamental: that he is the insured's "child" within the meaning of the Act. The Act's basic grant of benefits provides that "[e]very child (as defined in section 416(e) of this title) . . . of an individual who dies a fully or currently insured individual . . . shall be entitled to a child's insurance benefit . . . ." *Id.* § 402(d)(1). As relevant here, § 416(e) is sparse: "The term 'child' means (1) the child or legally adopted child of an individual." *Id.* § 416(e)(1).

Section 416(e)(1), however, is not the only provision of the Act that bears on the determination of child status. Section 416, titled "Additional definitions," also includes § 416(h), labeled "Determination of family status." That provision states:

---

[2]There is some question whether W.M.S. could satisfy § 402(d)(1)(C)(ii)'s dependency requirement, but because we agree with the SSA that W.M.S. is not Don Schafer's "child" under the Act we need not resolve this issue.

> In determining whether an applicant is the child . . .
> of a fully or currently insured individual for purposes
> of this subchapter, the Secretary shall apply such law
> as would be applied in determining the devolution of
> intestate personal property by the courts of the State
> in which such insured individual . . . was domiciled
> at the time of his death . . . . Applicants who accord-
> ing to such law would have the same status relative
> to taking intestate personal property as a child . . .
> shall be deemed such.

*Id.* § 416(h)(2)(A).

Section 416(h) also provides three additional gateways to child status for those who cannot establish it through § 416(h)(2)(A)'s intestacy provision. First, an applicant who "is a son or daughter of a fully or currently insured individual" but cannot inherit from that individual is deemed a child if his parents went through a marriage ceremony that turned out to be legally invalid. *Id.* § 416(h)(2)(B). Second, a child who cannot inherit from a deceased insured individual under state intestacy law is a "child" under the Act where prior to death the decedent "had acknowledged [parentage] in writing," "had been decreed [the child's parent] by a court," or "had been ordered by a court to contribute to the support of the applicant because the applicant was [the insured individual's child]." *Id.* § 416(h)(3)(C)(i)(I)–(III) (internal subsection divisions omitted). Third, a child who cannot inherit is deemed a "child" if "such insured individual is shown by evidence satisfactory to the Secretary to have been the [parent] of the applicant, and such insured individual was living with or contributing to the support of the applicant at the time such insured individual died." *Id.* § 416(h)(3)(C)(ii).

In addition, the Act gives the Commissioner of Social Security rulemaking authority. *See id.* § 405(a).

### B.

This case turns on the relationship between the brief definition of "child" in § 416(e)(1) — which is part of the only definition referred to in § 402(d)(1)'s basic grant of benefits—and § 416(h)'s more specific provisions. On the SSA's view, § 416(h) "provides the analytical framework that [it] must follow for determining whether a child is the insured's child" for purposes of § 416(e)(1)'s definition. Social Security Acquiescence Ruling 05-1(9), 70 Fed. Reg. 55,656, 55,657 (Sept. 22, 2005) ("Acquiescence Ruling"); *see also* 20 C.F.R. § 404.355(a) (using § 416(h)'s provisions as the only means of establishing child status as a natural child). In keeping with this view, the SSA has always required applicants claiming natural child status—including the undisputed biological children of married parents—to pass through one of § 416(h)'s pathways to secure that status. *See, e.g.*, Old-Age, Disability, Dependents' and Survivors' Insurance Benefits, 44 Fed. Reg. 34,479, 34,487 (June 15, 1979) (listing the same requirements in an earlier version of 20 C.F.R. § 404.355 as part of a restatement of the applicable regulations).

The SSA has also taken the view that posthumously conceived children such as W.M.S. can qualify as "children" under the Act only through the state intestacy provision. *See* Acquiescence Ruling, 70 Fed. Reg. at 55,657 ("[T]o meet the definition of 'child' under the Act, an after-conceived child must be able to inherit under State law."); Program Operations Manual System GN 00306.001(C)(1)(c), *available at* https://secure.ssa.gov/poms.nsf/lnx/0200306001 (same).[3] The insured parent of such a child by definition died prior to the

---

[3]Although Schafer's primary argument is that W.M.S.'s inheritance rights are irrelevant to child status, she argues alternatively that W.M.S. can inherit from Don Schafer under Virginia law. Because she does not contend W.M.S. has child status under any of § 416(h)'s other provisions, we need not address the SSA's position that posthumously conceived children may only secure child status through § 416(h)(2)(A).

child's conception, and therefore parentage could not have been acknowledged or decreed prior to death, nor could the applicant have been living with or receiving contributions from the decedent when the decedent passed away.

On the SSA's view, then, W.M.S. is entitled to benefits only if he could inherit from Don Schafer under Virginia law. But Virginia law does not recognize any "child born more than ten months after the death of a parent" as that parent's child for intestacy purposes. Va. Code Ann. § 20-164 (ten-month limitation); Va. Code Ann. § 64.1-5.1(2) (incorporating the provisions of Va. Code Ann. § 20-156 *et seq.* in determining the parentage of "a child resulting from assisted conception"). W.M.S., however, was born almost seven years after Don Schafer's death. The SSA therefore denied W.M.S.'s claim.

Schafer takes a very different view of the relationship between § 416(e)(1) and § 416(h). Adopting the view of *Gillett-Netting v. Barnhart*, 371 F.3d 593, 597 (9th Cir. 2004), she argues that § 416(h)'s strictures do not apply to children whose "parentage . . . is not disputed." After all, § 402(d) refers explicitly to § 416(e), not § 416(h), in defining "child," and on her view § 416(e)(1)'s plain terms — "the child or legally adopted child of such individual" — obviously cover such children. *See Weinberger v. Salfi*, 422 U.S. 749, 781 n.12 (1975) (describing § 416(e)(1)'s reference to a "child" as a reference to a "natural" child). It follows, she argues, that W.M.S.'s ability to inherit from Don Schafer under Virginia intestacy law is irrelevant to determining W.M.S.'s child status. Instead, as Don and Janice Schafer's undisputed biological child, W.M.S. must only show that he meets the other statutory conditions described above. *See* 42 U.S.C. § 402(d)(1)(A)–(C). The Third Circuit has recently joined *Gillett-Netting* in accepting Schafer's reading in posthumous conception cases, *see Capato ex rel. B.N.C. v. Comm'r of Soc. Sec.*, ___ F.3d ___, 2011 WL 9368 (3d Cir. Jan. 4, 2011), and the Eighth Circuit is currently facing the question, *see Beeler*

*v. Astrue*, No. C09-0019 (N.D. Iowa Nov. 12, 2009), *appeal docketed*, No. 10-1092.

### III.

In deciding between these warring interpretations, it is important to bear in mind the rules of engagement. We first ask, at *Chevron* step one, whether "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. If so, the agency is not free to counter Congress's command, and the courts must uphold faithful interpretations and reject disobedient ones. But where "a statute is silent or ambiguous with respect to the specific issue," a reviewing court at *Chevron* step two asks "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

At first blush, Schafer's proposed course—rejecting the SSA's interpretation at *Chevron* step one—is an alluring one. After all, "the plain language of the statute" is "the most reliable indicator of Congressional intent," *Soliman v. Gonzales*, 419 F.3d 276, 281–82 (4th Cir. 2005), and the plain meaning of "child" in § 416(e)(1) might seem necessarily to include the biological children of those who, because of tragic circumstances, could only become parents after their death. But for many reasons, we think this approach would be unsound. The "traditional tools of statutory construction," *Chevron*, 467 U.S. at 843 n.9, demonstrate that Congress intended the SSA to use state intestacy law, and even if it did not precisely speak to the question, the SSA's reasonable interpretation is entitled to deference.

### A.

We begin by examining the text of the Act. Section 416(e) itself is notably brief: "The term 'child' means (1) the child or legally adopted child of an individual . . . ." Although the "child" portion of this language does aim at natural children,

*see Salfi*, 422 U.S. at 781 n.12, other courts have noted that "this definitional tautology . . . does not provide much guidance" as to how the SSA should go about making that child status determination. *Conlon ex rel. Conlon v. Heckler*, 719 F.2d 788, 800 (5th Cir. 1983).

This lack of guidance highlights the difficulty we have with the position of our colleagues on the Third and Ninth Circuits. Those courts have been willing to elevate the sparse definition found in § 416(e)(1) and to completely de-emphasize the more extensive definition found in § 416(h)(2)(A), thereby treating Congress's more comprehensive efforts as a mere afterthought. In so doing, they have overlooked Congress's plain and explicit instruction on how the determination of child status should be made: "*In determining whether an applicant is the child* . . . of a fully or currently insured individual *for purposes of this subchapter*, the Secretary *shall apply* such law as would be applied in determining the devolution of intestate personal property . . . ." 42 U.S.C. § 416(h)(2)(A) (emphasis added). The text in short could hardly be more clear.

It would be startling if Congress had failed to provide greater guidance on child status than that set forth in § 416(e)(1). The term "child" lies at the core of the Act's benefit program, and until recent years proving biological parentage scientifically was next to impossible. *See* Jill Handley Andersen, *The Functioning Father: A Unified Approach to Paternity Determinations*, 30 J. Fam. L. 847, 852-53 & nn.36-45 (1991-92) (tracing the evolution of biological paternity testing). And though modern technology makes determining biological parentage scientifically feasible, it also creates situations that illustrate the complexity of determining the meaning of "child" today. *See Capato*, 2011 WL 9368, at *5. Imagine, for instance, a child born after one woman's fertilized ovum was implanted in and carried to term by another woman. It is unclear, as a linguistic matter, whether the child is the birth mother's "child," the biological mother's "child,"

or, somehow, both. In short, we think it very unlikely Congress would have left the SSA so utterly in the dark about such a critical term.

Of course, *Capato* and *Gillett-Netting* contend that § 416(e)(1) provides plenty of guidance, insisting that because "child" ordinarily means "natural child," § 416(e)(1) independently provides child status to those children whose "natural, or biological" parentage is not "disputed." *Gillett-Netting*, 371 F.3d at 596, 597. But this cannot be right. To begin with, it would attribute inconsistent views about child status to the Congress. In § 416(h)(3)(C)(ii), Congress provided child status to a child who cannot inherit but who can prove *both* that the insured was the child's parent *and* that the insured was "living with or contributing to" the child at the time of death. But if undisputed biological parentage is enough under § 416(e)(1), it would have made no sense for Congress to require those whose parentage was initially disputed but was then resolved to prove something in addition to biological parentage. Similarly, § 416(h)(2)(B) grants child status to a non-inheriting child only if he or she "is the son or daughter of [the] insured" — demonstrating that parentage is no longer in dispute — *and* if his or her parents went through a legally invalid marriage ceremony. Congress would not have imposed an additional proof requirement on these undisputed children if undisputed biological parentage sufficed under § 416(e)(1).

Sensing this difficulty of reading "child" to mean natural child, *Capato* and *Gillett-Netting* alternatively hint that the class of children independently provided child status by § 416(e)(1) is comprised of the undisputed biological children of *married* parents. *See Capato*, 2011 WL 9368, at *3; *Gillett-Netting*, 371 F.3d at 596. This approach solves part of the problem by "explaining" why out-of-wedlock children struggled to gain child status, but the solution comes at too high a price. Both *Gillett-Netting* and *Capato* insist that the plain English meaning of "child" in § 416(e)(1) drives their views.

*See Capato*, 2011 WL 9368, at \*3; *Gillett-Netting*, 371 F.3d at 596. But whatever their legal rights may be, out-of-wedlock children are indisputably the natural children of their biological parents under the ordinary English usage of the term. Therefore, *Capato* and *Gillett-Netting* cannot state that § 416(e)(1) covers the children of only *married* couples without contradicting their earlier claim that § 416(e)(1)'s supposedly obvious usage of "child" meant all natural children.

It is clear, then, that § 416(e)(1) cannot provide all of the answers. But there is no need for us to join *Capato* and *Gillett-Netting* in crafting from whole cloth § 416(e)(1)'s meaning without reference to the Act's other provisions when the plain text of those provisions offers all of the guidance that is needed. Section 416(h)(2)(A) describes precisely how one ought to determine the meaning of "child" under § 416(e)(1): "*In determining whether an applicant is the child . . . of a fully or currently insured individual for purposes of this subchapter*" — that is, for the purposes of federal old-age, survivors, and disability insurance benefits — "the Secretary *shall apply* such [state] law as would be applied in determining the devolution of intestate personal property . . . ." 42 U.S.C. § 416(h)(2)(A) (emphasis added).

This language contains no textual suggestion that it is limited to disputed or out-of-wedlock children. Indeed, everything about it suggests the opposite: it speaks of applying state intestacy law for purposes of the whole Act rather than for purposes of determining child status in disputed parentage cases, and it specifically addresses itself to the child status determination that must take place in evaluating every benefits application.

Of course, the SSA's interpretation might seem to create a few textual puzzles of its own. If Congress intended all applicants to proceed through one of § 416(h)'s channels in claiming child status under § 416(e)(1), it could have referred to that provision rather than § 416(e) in defining "child" for pur-

poses of § 402(d)'s basic grant of benefits. And if § 416(e)(1) does not independently provide child status to even the undisputed biological child of married parents, Congress may have been better off leaving it out of the statute, an outcome the SSA's interpretation might seem to reach.

These difficulties are more apparent than real. Consider first the point about Congress's reference to § 416(e), not § 416(h), in § 402(d)'s basic grant. As an initial matter, it is not at all unusual for Congress to refer explicitly only to one section even though some of that section's terms are given their full import by another, unmentioned section. *See, e.g*, 29 U.S.C. § 626(a) (granting the EEOC investigative authority "in accordance with the powers and procedures provided" in 29 U.S.C. §§ 209 and 211, the first of which largely just incorporates 15 U.S.C. §§ 49 and 50).

More importantly, on the SSA's view § 416(e) still has work to do even if § 416(h) provides the ultimate framework for securing child status under § 416(e)(1). Section 416(e)(1) clarifies that natural children and legally adopted children are included, § 416(e)(2) includes certain stepchildren, and § 416(e)(3) includes some grandchildren and stepgrandchildren. *See Conlon*, 719 F.2d at 800 ("Section 416(e) primarily places stepchildren and certain grandchildren within the definition of 'child.'"). This inclusion importantly expands the scope of the Act and distinguishes it from narrower benefits programs. In *Cleland v. Office of Personnel Management*, 984 F.2d 1193, 1195 (Fed. Cir. 1993), for example, the court rejected a federal employee's grandchild's claim to survivorship benefits under 5 U.S.C. § 8341(e)(2) and referred to § 416(e) in noting that "[w]hen Congress wishes to include grandchildren within the meaning of 'child' for purposes of a statute it knows how to do so." Thus, even if § 416(h) pulls the laboring oar in defining "child" within the context of natural children, § 416(e) still plays an important role.

Nor is it particularly significant that § 416(e)(1) itself plays a complementary role on SSA's view. For one thing, it still

contributes to § 416(e)'s overall purpose — cataloging the kinds of children included as "children" under the Act—by specifying that natural children and legally adopted children are included. For another, it is not clear just how the SSA *could* give "full meaning" to the statutory proposition that "a 'child' is a child" without help from neighboring provisions, especially once one recognizes that giving it too exclusively biological a meaning conflicts with § 416(h)(3)(C)(ii).

Considering all of the textual evidence, then, we think Congress plainly intended the SSA to apply the Act as the SSA always has. The SSA's view follows to the letter Congress's explicit and precise instruction as to how the agency should determine child status under the Act. Moreover, the SSA's interpretation, rather than focusing myopically on a single term, makes sense of the statute as a whole, *see Soliman*, 419 F.3d at 282, and recognizes that the "meaning . . . of certain words or phrases may only become evident" when considered in textual and historical context, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). Whether one looks at the instruction of § 416(h)(2)(A) individually or at the statute as a whole, the SSA's view is dutiful and faithful to Congress's intent.

## B.

The Act's history also suggests that the SSA is respecting Congress's wishes. *See, e.g.*, *Elm Grove Coal Co. v. Dir., O.W.C.P.*, 480 F.3d 278, 293-94 (4th Cir. 2007) (consulting the history of Congress's efforts at *Chevron* step one). We are of course not the first court to look to the Act's history in determining its meaning. *Gillett-Netting* relied heavily on its view that § 416(h)(2) and § 416(h)(3) "were added to the Act to provide various ways in which children could be entitled to benefits even if their parents were not married or their parentage was in dispute." *Gillett-Netting*, 371 F.3d at 596. As a result, *Gillett-Netting* believed those provisions have no application to those who do not face such circumstances.

But insofar as *Gillett-Netting* meant to suggest the intestacy provision was not part of the original statutory framework, it is simply wrong. The original version of the Act contained a framework identical in fundamentals to the one on the books today: a grant of benefits to every "child" as defined by one provision of the Act, *see* Social Security Act Amendments of 1939, Pub. L. No. 76-379, § 202(c)(1), 53 Stat. 1360, 1364; a definition of "child" in that section as "the child of an individual," *id.* § 209(k), 53 Stat. at 1377; and another definition instructing the SSA to "apply such law as would be applied in determining the devolution of intestate personal property" under state law to "determin[e] whether an applicant is the . . . child [of the insured]," *id.* § 209(m), 53 Stat. at 1378. Although these provisions were altered and renumbered over the years, the basic structure remained intact. That is, some version of § 416(h)(2)(A) has always been part of the statutory scheme, weakening any inference that it is just a new way for disputed children to gain child status.

Indeed, when considered in greater detail, the Act's legislative history demonstrates that Congress understood § 416(h)(2)(A)'s intestacy provisions to be the backbone of all child status determinations. The Senate Finance Committee's Report to the 1965 Amendments, which added § 416(h)(3)(C), stated that "[u]nder present law, whether a child meets the definition of a child for the purpose of getting child's insurance benefits . . . depends on the laws applied in determining the devolution of intestate personal property . . . ." S. Rep. No. 89-404, pt. 1, at 109 (1965), *reprinted in* 1965 U.S.C.C.A.N. 1943, 2049.

Congress's belief in this regard was well-grounded: a great deal of case law held that all those claiming child status had to prove the ability to inherit under state law. *See, e.g.*, *Gainey v. Flemming*, 279 F.2d 56 (10th Cir. 1960) (affirming denial of benefits to undisputed children of an invalid marriage because the children could not inherit); *Robles v. Folsom*, 239 F.2d 562 (2d Cir. 1956) (Hand, J.) (affirming denial of bene-

fits to an undisputed child who had always been supported by his unmarried father because the child could not inherit); *Hobby v. Burke*, 227 F.2d 932, 933 n.3 (5th Cir. 1956) (noting that § 416(e)'s definition of "child" is "further defined" in § 416(h)'s intestacy provisions).

The 1965 Amendments themselves demonstrate Congress's continued acceptance of this basic framework. The Senate Report noted the problem the framework created: children whom Congress viewed as similarly situated were treated differently for child status purposes simply because state law denied out-of-wedlock children inheritance rights. *See* S. Rep. No. 89-404, 1965 U.S.C.C.A.N. 1943, at 2050. To fix the problem, however, Congress did not change the received view of the law and "clarify" that all undisputed children are "children" under § 416(e)(1). Instead, it worked within the framework of the background intestacy provision, adding § 416(h)(3)(C) so that child status could also exist where parentage was acknowledged, decreed, implicit in a contribution order, or proven along with cohabitation or contribution. *See id.*; *McMillian ex rel. McMillian v. Heckler*, 759 F.2d 1147, 1149–50 (4th Cir. 1985) (noting that § 416(h)(3)(C) provides means for out-of-wedlock children to establish child status).

Indeed, § 416(h)(3) certainly sounds like an exception to a general requirement: "An applicant who is the son or daughter of a fully . . . insured individual, but who is not (and is not deemed to be) the child of such insured individual under [the state intestacy or legally invalid marriage provisions], shall *nevertheless* be deemed to be the child of such insured individual" upon meeting one of § 416(h)(3)(C)'s conditions. 42 U.S.C. § 416(h)(3) (emphasis added).

The Act's legislative history could hardly be clearer. Congress understood the Act's framework as requiring all natural children to pass through § 416(h) to claim child status, and it drafted in keeping with this view in adding § 416(h)(3)(C).

### C.

The SSA's interpretation also best comports with the Act's purposes. *See, e.g.*, *Elm Grove*, 480 F.3d at 293 (looking to the statute's purpose at *Chevron* step one). The Act is not a "welfare program generally benefiting needy persons," but rather an effort to "provide the . . . dependent members of [a wage earner's] family with protection against the hardship occasioned by his loss of earnings." *Califano v. Jobst*, 434 U.S. 47, 52 (1977); *see also* S. Rep. 89-404, 1965 U.S.C.C.A.N. 1943, at 2050 (describing survivorship benefits as "a national program . . . intended to pay benefits to replace the support lost by a child when his father . . . dies . . . ."). The Act thus creates a core beneficiary class: the children of deceased wage earners who relied on those earners for support.

The Act's child status provisions reflect this basic aim. For instance, § 416(h)(3)(C)(ii) grants child status to those who are proven to be the biological child of the insured provided the insured was "living with or contributing to" the child at the time of death. Similarly, § 416(h)(3)(C)(i), which grants child status to those whose parentage is acknowledged, decreed, or implicit in a contribution order, suggests similar dependence on the wage earner because the acknowledgment or decree must occur prior to the insured's death and because such acknowledgment or decree is likely to be accompanied by financial outlays from the insured. Section 416(h)(2)(A) is no different. As the Supreme Court has noted in assessing the Act's deemed dependency provisions, "where state intestacy law provides that a child may take personal property from a father's estate, it may reasonably be thought that the child will more likely be dependent during the parent's life and at his death." *Mathews v. Lucas*, 427 U.S. 495, 514 (1976).

The SSA's interpretation, by tying natural child status determinations to one of § 416(h)'s pathways, thus reflects the Act's basic aim of primarily helping those children who lost

support after the unanticipated death of a parent. Posthumously conceived children, however, differ from members of the core beneficiary class in two ways. First, they necessarily could not have relied on the wage earner's wages prior to his death. Second, they generally come into being *after* it is clear that one of the parents will not be able to support the child in the ordinary way during the child's lifetime, meaning that the survivorship benefits would serve a purpose more akin to subsidizing the continuance of reproductive plans than to insuring against unexpected losses.

These differences might have persuaded Congress to exclude most posthumously conceived children from child status under an updated version of the Act. But the current statute, on the SSA's interpretation, properly includes as children those posthumously conceived children whom state lawmakers conclude are similarly situated enough to more traditionally conceived children that they deserve a share in the decedent's estate. In making this determination, state posthumous conception schemes often reflect the same concerns animating the Act's creation of the core beneficiary class, thereby both protecting the Act's chief intended aid recipients and expanding child status to cover closely analogous cases.

Through heightened consent requirements, for example, state posthumous conception laws ensure that child status and inheritance rights go only to those whom the deceased parent intended to support as a child. *See, e.g.*, Va. Code Ann. § 20-158(B) (generally requiring consent in writing to be the parent of any child resulting from implantation after one's death); Colo. Rev. Stat. § 19-4-106(8) (same); Utah Code Ann. § 78B-15-707 (same). The time limitations often imposed on posthumously conceived children's inheritance rights similarly reflect the concerns underlying the Act by protecting the estate for already existing children, the core intended beneficiaries of the Act. *See, e.g.*, Va. Code Ann. § 20-164 (ten-month limit); Cal. Prob. Code § 249.5(c) (two-year limit from

acknowledged death); La. Rev. Stat. Ann. § 9:391.1(A) (three-year limit).

By contrast, Schafer's interpretation contravenes the statute's purpose by threatening the core beneficiary class. She claims the Act provides child status to any undisputed biological child. But, as the Commissioner notes, the Act limits the total benefits payable from one employment record. *See* 42 U.S.C. § 403(a)(1). As a result, where an additional child claims benefits from a record, children already claiming from it could see a reduction in their benefits. Though the additional benefits would generally stay in the same family, it remains true that existing children, the Act's core intended beneficiaries, could receive proportionately less support. Congress designed the Act with those children in mind, and the SSA's interpretation best protects their interests.

## D.

Our conclusion that Congress intended the SSA to use state intestacy law as it does is buttressed by a good deal of case law favoring the SSA's view. For instance, *Conlon* squarely held that all child status determinations must pass through § 416(h). The court noted that § 416(e)'s primary function is to include some stepchildren and grandchildren within the scope of the Act, not to fully define "child," and it pointed out the difficulty in seeing § 416(e)(1)'s sparse language as the Act's main provision dealing with child status. *See Conlon*, 719 F.2d at 800. The court also reasoned that Congress did not leave the SSA adrift; "[s]ection 416(e)(1) is . . . modified by sections 416(h)(2) and (3) *which provide the final words* on who is to be considered a child for purposes of section 416(e)(1)." *Id.* (emphasis added). That is, "because [the applicant did] not fit within the definition of a 'child' under either section 416(h)(2)(A) or section 416(h)(3)(C)(i)(II), she would not be considered a child under section 416(e)." *Id.*

Many cases also reflect the SSA's view. For example, many of the state supreme courts to consider the inheritance

rights of posthumously conceived children did so only because a federal district court certified the state law question to them as dispositive of a benefits claim. *See, e.g.*, *Finley v. Astrue*, 270 S.W.3d 849 (Ark. 2008); *Khabbaz ex rel. Eng v. Comm'r, Soc. Sec. Admin.*, 930 A.2d 1180 (N.H. 2007); *Woodward v. Comm'r of Soc. Sec.*, 760 N.E.2d 257 (Mass. 2002).

Federal circuit courts have also accepted the SSA's position. Recently the D.C. Circuit noted:

> The Act establishes the following procedure to determine whether an individual qualifies as a "child." "Child" is defined [in § 416(e)], *inter alia*, as "the child or legally adopted child of an individual." To determine whether an applicant meets the Act's definition of "child," the SSA must: "apply such law as would be applied in determining the devolution of intestate personal property . . . ."

*Javier v. Comm'r of Soc. Sec.*, 407 F.3d 1244, 1247 (D.C. Cir. 2005) (quoting 42 U.S.C. § 416(h)(2)(A)) (citation omitted). Similarly, *DeSonier v. Sullivan*, 906 F.2d 228, 229–30 (6th Cir. 1990), stated that "[t]he ALJ recognized that a claimant's relationship to a deceased wage earner is determined by applying [state intestacy law]" and that "[d]etermination of a claimant's family status is made by applying the provisions of 42 U.S.C. § 416(h)."

None of these cases mention any restriction of § 416(h)'s operation to cases involving disputed parentage. Although many involve such circumstances, that fact is more attributable to the paucity of benefit denials where a legitimate biological child seeks benefits than to judicial disagreement with the SSA's long-held view; as the SSA has noted, every state provides inheritance rights to such children. *See* Application of State Law in Determining Child Relationship, 63 Fed. Reg. 57,590, 57,591 (Oct. 28, 1998). We think it unlikely that so

many courts over so many years have been wrong, and obviously so, in their understanding of Congress's intent.

E.

The text, legislative history, purpose, and prior judicial approaches to the Act indicate that Congress wanted the SSA to apply § 416(h) in determining child status. Schafer's contrary view takes a single, sparse statutory word and makes it the statute's primary statement on the majority of survivorship benefit applications. It relegates Congress's most detailed and comprehensive effort to define "child" under the Act to the status of a fallback provision, one that only applies where parentage is "disputed." This limitation runs against the grain of § 416(h)'s text, § 416(h)(3)(C)'s history, and the SSA's obvious need for congressional guidance. This seems a wrong turn, but fortunately it is not one the statute compels us to take. Indeed, the Act tells us to go in the other direction, the one that the SSA has always followed.

IV.

The SSA's position becomes even stronger considering the administrative law context in which we find ourselves. Even if one were to disagree that the Act dictates the SSA's interpretation, the considerable evidence for the SSA's view at least demonstrates statutory ambiguity. To recapitulate, § 416(h)(2)(A)'s clear instruction and comprehensive approach significantly undermines the view that § 402(d)'s basic grant and § 416(e)(1)'s sparse definition independently confer child status on undisputed children. *Gillett-Netting* and *Capato* cannot offer an interpretation of § 416(e)(1) that makes sense of § 416(h)(3)(C). The 1965 Amendments' history indicates that Congress drafted them with the understanding that all child status determinations were made initially through state intestacy law, calling into question Schafer's view that § 416(h)'s provisions are obviously just alternate pathways. And the longstanding, ubiquitous judicial accep-

tance of the SSA's interpretation suggests it is far from unreasonable.

Given that the Act is at least ambiguous, the barrier to Schafer's challenge is steep. "[W]e may not disturb an agency rule [at *Chevron* step two] unless it is 'arbitrary or capricious in substance, or manifestly contrary to the statute.'" *Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 711 (2011) (quoting *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 242 (2004)). *Chevron* deference of this sort stands at the heart of modern administrative law. It ensures that agency officials, who are subject to greater political accountability and possess greater relevant expertise than judges, take the lead in implementing programs delegated to their care. *See Chevron*, 467 U.S. at 865–66. The SSA's interpretation easily passes muster under this deferential standard.

Of course, the same factors that led us to conclude above that the SSA's interpretation best respects Congress's intent demonstrate that the SSA's resolution of any statutory ambiguity is a permissible one. But there is more to be said in favor of deferring to the SSA's interpretation. Deferring here affords Congress, the SSA, and the federal courts their proper places in the modern regulatory scheme.

Congress, of course, has the last word in determining the scope of federal survivorship benefits. It is unlikely that Congress is unaware of the SSA's longstanding interpretation of the Act. Given the rapid rise of issues related to reproductive technology, Congress would hardly be ignorant of the fact that some children such as W.M.S. will not receive benefits because of current state intestacy law. We are hesitant to strike out ahead of Congress by addressing this increasingly important issue through a novel interpretation of the Act. Although Congress can change the Act regardless of what we decide, we pay greater respect to its legislative primacy by letting it forge the future path, especially where its previous

enactments are at worst ambiguous and most likely prescribe the approach the SSA is already taking.

Furthermore, upholding the SSA's interpretation reflects the basic division of labor between courts and agencies. It is our duty to interpret and enforce statutes, not to update and revise them in light of changing technological circumstances. "Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement." *Badaracco v. Commissioner*, 464 U.S. 386, 398 (1984). This proscription against tinkering applies equally to ambiguous statutes entrusted by Congress to an agency. Indeed, that is the whole point of *Chevron* deference. The SSA has extensive experience in administering the Act's survivorship benefits program, as well as the legal and practical ability to respond more quickly to changing regulatory circumstances. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005). It also faces political checks from Congress and the President, likely keeping its policymaking within the bounds of the democratically acceptable. *See Chevron*, 467 U.S. at 865–66. In short, this is a case where courts are well advised to leave the fine-tuning of statutory regimes to others.

Moreover, this is not a case where an agency seeks to aggrandize its regulatory powers by aggressively reinterpreting a statute. *See, e.g.*, *Brown & Williamson*, 529 U.S. at 126, 145–46 (rejecting the FDA's sudden attempt to regulate tobacco products). Rather, the SSA seeks only to maintain its long-held position, one that keeps primary responsibility for determining child status in states' hands. This approach makes perfect sense. Section 416(h)(2)(A) suggests a strong desire on Congress's part to use state law in administering the federal program, as do other provisions in the Act. *See* 42 U.S.C. § 416(h)(1)(A)(i)–(ii) (generally determining whether an applicant is the "wife, husband, widow, or widower" of an insured by reference to state family and intestacy law). The Act also reflects a desire to work collaboratively with the

states in providing benefits. *See, e.g.*, *id.* § 421 (allowing states to request the ability to determine disability status).

Congress's efforts toward cooperative federalism here are hardly surprising. Family and inheritance law fall squarely within the states' historic competence, *see, e.g.*, *Ankenbrandt v. Richards*, 504 U.S. 689, 703–04 (1992), and their input into the federal benefits program can only redound to its advantage. Moreover, as Schafer's case perfectly illustrates, these areas of law are slippery ones, constantly requiring adjustments so as to account for changing technological and social realities. The states have demonstrated a legislative willingness to account for the new biological world in which we find ourselves, and we are loath to fault the SSA for maintaining an interpretation that encourages an adaptive response from deliberative, democratically-elected bodies in a complex and evolving area.

Jettisoning the SSA's approach would "short-circuit what looks to be a prompt and considered" development of state law. *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 129 S. Ct. 2308, 2322 (2009). It would also thrust the federal courts into "a myriad of other issues," *id.* at 2323, including policy-driven questions about the child status of those born to surrogate mothers, those resulting from artificial insemination of sperm from someone other than the mother's husband, and so on, *see Capato*, 2011 WL 9368, at *5. "The elected governments of the States are actively confronting" the challenges posed by modern reproductive technology. *Osborne*, 129 S. Ct. at 2322. And "there is no reason to suppose that [federal courts'] answers to these questions would be any better than those of state courts and legislatures, and good reason to suspect the opposite." *Id.* at 2323.

Congress, on the SSA's view, has created a scheme allowing the full resources of our federal system to be brought to bear on the novel and complex issues posed by modern reproductive technology. In so doing it has ensured that those chil-

dren whom state policymakers decide should stand in the same shoes as more traditionally conceived children for inheritance purposes do so for the analogous purposes underlying child status under the Act. We will not disturb this long-lived effort at federal-state cooperation, especially where the SSA's construction of the Act seems not only permissible, but also correct.[4]

V.

As is often the case when applying the law, our decision is not without its costs. The tragedies of cancer and heart disease pulled the Schafer family's plans out from under them. While modern medicine allowed Janice Schafer to partially fulfill some of those plans years later, Virginia intestacy law, as incorporated by the Act, does render survivorship benefits unavailable here.

But if sad facts make hard cases, we cannot allow hard cases to make bad law. Congress instructed the SSA to apply the Act just as it always has. Its interpretation harmonizes the Act as a whole, coheres with § 416(h)(2)(A)'s broad text, and leaves ample work for § 402(d)(1)'s reference to § 416(e). It comports with Congress's background understanding of the Act's operation and with Congress's aim of helping those who unexpectedly lost a parent's support. And it harnesses the cooperative effort of state legislatures in confronting the novel, complex, and contestable issues arising out of new

---

[4]Schafer also contends that the SSA's interpretation violates the Equal Protection Clause. Because the statute classifies on the basis of ability to inherit under state intestacy law, it requires only rational basis review, *see City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985), and it passes muster as rationally related to the government's interests in providing benefits primarily to children of deceased wage earners who relied on those wage earners for support. *See Lucas*, 427 U.S. at 507–09; *Vernoff v. Astrue*, 568 F.3d 1102, 1112 (9th Cir. 2009). Schafer also contends that W.M.S. can inherit under Virginia law, but we find no fault in the district court's rejection of that claim.

technology. And even if Congress did not explicitly dictate the use of state intestacy law, the SSA's interpretation is certainly a reasonable one. *Chevron* deference was made for circumstances like these, and we cannot invert well-established administrative law doctrines simply to reach a certain result.[5] The judgment of the district court is therefore affirmed.

*AFFIRMED*

DAVIS, Circuit Judge, dissenting:

The majority contends that "the plain text of th[e]se provisions offers all of the guidance that is needed," Maj. Op. at 11, and I agree. But where the majority believes that "Congress plainly intended" that 42 U.S.C. § 416(h)(2)'s definition

---

[5] For many of these same reasons, we are unpersuaded by our fine colleague's dissent. It neglects the fact that (1) Congress has told us quite clearly how to determine "whether an applicant is the child" in § 416(h)(2)(A); (2) that Congress has for years entrusted the SSA with "full power and authority to make rules and regulations" in carrying out these very provisions, *see* 42 U.S.C. § 405(a); (3) that the Supreme Court has mandated deference to agencies even in ambiguous situations, not to mention in situations such as this where the Act's instructions are plain, *see Chevron*, 467 U.S. at 843; (4) that Congress sought to harness the states' family law experience and updating prowess in an exercise of cooperative federalism; (5) that the Act's purpose was to protect those who had depended on the deceased wage earner, a purpose threatened by allowing unlimited posthumous access to the insured's limited total benefits, *see* 42 U.S.C. § 403(a)(1); (6) that defining "child" as "biological child" leaves the federal courts with a host of unanswered and unanswerable questions stemming from the numerous biological permutations already possible; (7) that reading § 416(e)(1) as giving child status to all biological children renders wholly superfluous Congress's nuanced efforts at providing child status for out-of-wedlock biological children in § 416(h)(3)(C); and (8) that avoiding this problem by reading § 416(e)(1) as giving child status only to children born in wedlock contradicts that term's supposedly plain meaning and nakedly rewrites the Act.

It is unlikely that a reading of the Act that has so many problems would be the best one. It is unthinkable that it would be the only permissible one under the *Chevron* decision.

of "child" control, *id.* at 13, I believe just the opposite: it could not be more clear that Congress instructed us to apply 42 U.S.C. § 416(e) in this case. And even if § 416(h) were to apply, proper consideration of § 416(h)(2)(B) would require that we reverse the district court.

## I.

This is not a case in which we must choose between two competing statutory definitions, for here *Congress has chosen for us*. The question before us is whether a posthumously conceived biological child is a "child" within the meaning of 42 U.S.C. § 402(d)(1), the provision guaranteeing benefits to a deceased wage earner's children. And § 402(d)(1) itself begins, "Every child (*as defined in section 416(e) of this title*) . . . ." (emphasis added). If that does not make Congress's choice clear enough, Congress went on to *specifically apply § 416(h)(2)'s definition of "child"* shortly after, in § 402(d)(3): "For purposes of this paragraph, a child deemed to be a child of a fully or currently insured individual *pursuant to section 416(h)(2)(B) or section 416(h)(3)* of this title shall be deemed to be the legitimate child of such individual." (emphasis added). That is, Congress *specifically* invoked § 416(e) in the provision at issue and went on to *specifically* invoke § 416(h) in a neighboring provision; it is difficult to imagine how Congress could have more clearly indicated that it understood the difference between the two definitions and was deliberately choosing to apply § 416(e)'s broader definition to the right-granting provision.

The majority dismisses this point, claiming "it is not at all unusual for Congress to refer explicitly only to one section even though some of that section's terms are given their full import by another, unmentioned section." Maj. Op. at 12. It cites only to 29 U.S.C. § 626(a), granting the Equal Employment Opportunity Commission investigative authority "in accordance with the powers and procedures provided in sections 209 and 211 of this title," because § 209 itself merely

empowers the EEOC to make use of investigatory powers granted to the Federal Trade Commission by 15 U.S.C. §§ 49-50. But § 209 *specifically cites* to the provisions it incorporates; here, the majority would *ignore* Congress's express directions and insert an implicit citation internal to § 416(e). It is not clear to me how Congress's decision not to recopy in full the powers granted the FTC in title 15 of the Code when granting these powers to the EEOC in title 42 is in any way relevant. The question raised by the majority's approach is why we should ignore Congress's explicit instruction that it was using "child" in §402(d)(1) "as defined in section 416(e) of this title" and instead look to a different definition in § 416(h), especially when Congress specifically cited to § 416(h)'s definition in a neighboring provision.

## A.

The majority's approach, while professing deference to the plain meaning of the statute, does great violence to it. Subsection 416(e) begins, "The term 'child' means (1) the child or legally adopted child of an individual . . . ." The majority would demote the first words of § 416(e) from Congressional instruction to irrelevant "tautology," rendering the first half of the provision—"the child . . . of an individual"—a nullity. Maj. Op. at 8-9

Dismissing as tautological a definition of "child" that includes "the child . . . of an individual" appears to commend itself to common sense, but it is sensible only if one overlooks the purpose of statutory definitions. Often they function not like dictionary entries, which set out the meaning of a word by deconstructing it into component concepts, listing its connotations, or explaining its association to similar words, but rather as support for a kind of legislative shorthand. Statutory definitions allow drafters to avoid repeating cumbersome lists filled with qualifications, as they can instead substitute a single word or phrase as an abbreviation. In this case, § 416(e)'s dense, 521-word description of those who qualify for a sur-

viving child's benefits (including "(2) a stepchild who has been such stepchild for not less than one year immediately preceding the day . . . (3) a person who is the grandchild or stepgrandchild of an individual or his spouse, but only if . . .") can be abbreviated throughout the subchapter as "child."

If one rejects the majority's claim of "tautology" as I do and instead recognizes that Congress *chose* to include "the child . . . of an individual" within the list of rights-holders, one is left with a familiar situation: a court is asked to determine whether a given factual situation fits within the class contemplated by the statute. That is, one must determine whether a posthumously conceived child is "the child . . . of an individual." Like any word, the word "child" comprises both a core of relations it clearly encompasses and a hazy periphery where the label becomes increasingly contested. *Cf.* H.L.A. Hart, *Positivism and the Separation of Law and Morals*, 71 Harv. L. Rev. 593, 606-07 (1958) (famously distinguishing "the hard core of standard instances or settled meaning" from the "penumbra of debatable cases in which [the term or rule] [is] neither obviously applicable nor obviously ruled out"). But a biological child birthed by its biological mother is clearly at the very core of the meaning of "child." (Even the majority grudgingly concedes that Congress's use of the word "child" here "does aim at natural children." Maj. Op. at 8.) The fact that appellant's child was conceived after his father's death does nothing to undermine the fact that, according to ordinary usage, her son is the "child" of his biological father. For the reasons given by the Third Circuit in *Capato ex rel. B.N.C. v. Comm'r of Soc. Sec.*, ___ F.3d ___, 2011 WL 9368 (3d Cir. Jan. 4, 2011), and the Ninth Circuit in *Gillett-Netting v. Barnhart*, 371 F.3d 593 (9th Cir. 2004), I would find that both the plain meaning of the statute and the relevant legislative history instruct the Commissioner to include biological children within the meaning of "child" as used in § 402(d)(1).

## B.

The majority justifies its reading of the statute by emphasizing § 416(e)'s "lack of guidance" and asserting that, as that subsection "cannot provide all of the answers," one must turn to § 416(h)(2)(A), which "describes precisely how one ought to determine the meaning of 'child' under § 416(e)(1)." Maj. Op. at 9, 11. The majority's certainty appears rooted in an instruction it quotes from § 416(h)(2)(A): "In determining whether an applicant is the child . . . of a fully or currently insured individual *for purposes of this subchapter*, the Commissioner of Social Security *shall apply* such [state] law as would be applied in determining the devolution of intestate personal property . . . ." Maj. Op. at 11 . Yet this quotation is misleading in two respects.

### 1.

First, it fails to reproduce the second and final sentence of § 416(h)(2)(A), which reads, "Applicants who according to such [state] law would have the same status relative to taking intestate personal property *as a child* . . . shall be deemed such." (emphasis added). That is, § 416(h)(2)(A) requires *precisely the same interpretation of "child"* that the majority fled from in § 416(e)(1). One cannot reasonably compare a claimant's status under intestacy to the status of "a child" until one settles on the definition of "child." Thus it makes little sense to abandon § 416(e)(1) on the ground that the word "child" is vague in favor of § 416(h)(2)(A), which *also* requires an extraneous definition of "child."

Moreover, this second sentence makes it pellucidly clear that § 416(h)(2)(A) *supplements*, rather than *replaces* § 416(e)(1). If one finds that a claimant fits within the definition of the comparator "child," then obviously he or she will have "the same status relative to taking intestate personal property *as a child*." Thus, any "child" within the meaning of § 416(e)(1) must, as a straightforward matter of logic, satisfy

§ 416(h)(2)(A). That this yields a strange result in a case like this one, where the relevant state intestacy law treats different classes of "children" differently and grants property to only some of them, underscores the difficulties with the majority's attempt to cast § 416(h)(2)(A) in the role of *deus ex machina*.

As a supplementary provision that requires an independent definition of "child" but provides no additional aid in constructing one, § 416(h)(2)(A) is not a helpful alternative to § 416(e)(1) for present purposes. Under either provision, one must still wrestle with the definition of "child."

And it is for this reason that the majority's attempt to subordinate § 416(e) to § 416(h)(2)(A) fails. Recognizing that § 416(e)'s inclusion of adopted children, stepchildren, grandchildren, and stepgrandchildren must have legal force— the Commissioner's regulations include them, *see* 20 C.F.R. §§ 403.354, 356-59— the majority suggests that § 416(e)(1) "clarifies that natural children and legally adopted children are included," and likewise for sections (e)(2) and (e)(3) and the other relations. Maj. Op. at 12. But if § 416(h) controls, exactly where in the text of the provision do these other relations fit in? As the first sentence only refers to the "applicant," it must be in the second sentence, which requires the Commissioner to compare the applicant's would-be status under intestacy with the status of "a child." And this would undo the majority's construction, for it would simply reveal § 416(h)(2)(A) to be a *supplement*, not a *replacement*, for § 416(e): looking to § 416(e) for the definition of "child" in § 416(h)(2)(A)'s second sentence, each relation covered in § 416(e) would automatically pass, since in each case one simply asks the redundant question of whether, say, a stepgrandchild inherits in the same manner as a stepgrandchild. If § 416(e) overrides the majority's mistaken view of § 416(h)(2)(A) in the exotic case of stepgrandchildren— that is, if one accepts the Commissioner's position, as stated at 20 C.F.R. 404.358, and acknowledge that a stepgrandchild is entitled to benefits regardless of his or her ability to take

under a particular state's intestacy law— it is not apparent why the same would not be true in the case of a biological child.

2.

There is still more to be said. The majority's use of the excerpt from § 416(h)(2)(A) is also misleading insofar as it claims that, given the paragraph's "shall apply such [state] law" language, "[t]he text . . . could hardly be more clear" about which provision applies. Maj. Op. at 9. That is, the majority appears to read the provision's mandatory language— "for the purposes of this subchapter . . . the Commissioner . . . shall apply such [state intestacy] law"— to mean that § 416(h)(2)(A) is a requirement that all claimants must meet. Yet, as the majority concedes earlier in the opinion, § 416(h) "also provides three additional gateways to child status for those who cannot establish it through § 416(h)(2)(A)'s intestacy provision." Maj. Op. at 5. Thus § 416(h)(2)(A)'s "shall apply" language is not to be read as "shall *only* apply"; rather, Congress is simply instructing the Commissioner to follow the precise process of applying and comparing situations under state intestacy law, not restricting the Commissioner to look only at § 416(h)(2)(A).

The majority strains to cast § 416(h)(3), one of these alternative paths, as "an exception to a general requirement," emphasizing that the provision states that a "son or daughter" who does not meet the requirements of § 416(h)(2)(A) or (B) "shall *nevertheless* be deemed to be the child of such insured individual." Maj. Op. at 15 (emphasis added by majority opinion). This is apparently meant to shield from attack the majority's conclusion that Congress was drafting "within the framework of the background intestacy provisions." Maj. Op. at 15. The problem is that when Congress repeats this verbal formula, which first appears in § 416(h)(2)(B), in § 416(h)(3), paragraph (2)(B) is cited alongside paragraph (2)(A). And paragraph (2)(B) has nothing to do with state intestacy law:

it qualifies the "son or daughter" of parents who "went through a marriage ceremony resulting in a purported marriage" that, "but for a legal impediment . . . would have been a valid marriage."

Furthermore, Congress's decision to label these provisions as (2)(A) and (2)(B) undermines the majority's suggestion that (2)(A) was meant to have pride of place as the "backbone" of the definitional framework. Maj. Op. at 14. Rather, it seems that when Congress instructed that the Commissioner "shall apply" state intestacy law and then compare the result to intestate takings of a "child," the mandatory language was a means of instructing the Commissioner to follow a precise process, not a way of implicitly undercutting § 416(e). Indeed, I expect that if Congress were to draft language that gave primacy in defining "child" to a subpart within a subsection entitled "Determination of family status" over the entirety of a subsection entitled "Children" (within § 416, the "Definitions" section), such a command would not be left implicit. *Cf. Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").

Yet the majority disputes the conclusions that emerge from the Third and Ninth Circuits' reviews of legislative history, which found that § 416(h) was meant to be *additive*— extending benefits to the children of unwed parents— rather than an attempt to supplant and, in places, narrow the scope of benefits promised by § 416(e)'s definition of "child." *See* Maj. Op. at 13-15. It quotes from the Senate Finance Committee's report on the 1965 amendments to the Social Security Act, which expanded children's survivorship benefits (immediately granting benefits to an estimated twenty thousand people) "*without regard* to whether he has the status of a child under State inheritance laws." S. Rep. 89-404, pt. 1, at 14 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 1943, 1958 (emphasis added). This reference, says the majority, demonstrates that § 416(h)(2)(a)'s intestacy provisions are "the backbone of all child status determinations." Maj. Op. at 14.

But it is far more likely that Congress was simply referring back to the intestacy provisions *because they were the first to extend coverage beyond biological children*. As the Commissioner has conceded, Congress believed that "all state laws . . . provided for inheritance of marital children." Br. of Appellee, at 33; *see also* 43 Fed. Reg. 57590, 57591 (1998) (finding that "a 'child of a valid marriage' has inheritance rights under the laws of all states"). The report's reference to § 416(h)(2)(A) is simply a reference to an expanded scope of survivorship benefits reaching *beyond* marital children; not a suggestion that paragraph (2)(A) was *limiting* benefits granted via § 416(e)'s "plain language" definition.

In the absence of any indication that the statutory framework is not as it seems, there is no reason to imagine that § 416(h) somehow usurps § 416(e), and thus we should not second-guess Congress when it *specifically cites* to the definition of "child" in § 416(e) (and goes on to *specifically cite* to the differing definitions in § 416(h) in a following provision). The majority is correct that "[t]he text . . . could hardly be more clear," but it misapprehends that meaning. When Congress states in § 402(d)(1), "Every child (*as defined in section 416(e) of this title*)," that is precisely where one should look for a definition. (emphasis added).

## C.

The majority invokes *Chevron* deference to the Commissioner's regulations to bolster its case. *See* Maj. Op. at 8. Yet even if the Commissioner can survive *Chevron* step one, his interpretation fails at step two because it presupposes that § 416(h) supplements, rather than replaces, § 416(e), and thus his refusal to recognize § 416(e)'s inclusion of biological children is not reasonable. The Commissioner, like the majority, simply misapprehends the statutory language and, most assuredly, the statutory purpose.

The Commissioner recognizes that § 416(e)'s list of beneficiaries controls; thus he provides in § 404.354, "You may be

related to the insured person in one of several ways and be entitled to benefits as his or her child, i.e., as a natural child, legally adopted child, stepchild, grandchild, stepgrandchild, or equitably adopted child." Sections 404.355-39 detail the means by which one may establish these relationships. Yet § 416(h) makes no mention of stepchildren, grandchildren, or stepgrandchildren; indeed no provision but § 416(e), accepted as a definition for "child" in §402(d)(1), would authorize the Commissioner to grant all of these individuals benefits.

As the statute grants the Commissioner rulemaking authority, 42 U.S.C. § 405(a), his regulations are "entitled to deference if they resolve [any] statutory ambiguity in a reasonable manner." *Coeur Ala., Inc. v. Se. Ala. Conservation Council*, 129 S. Ct. 2458, 2469 (2009); *see Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). Though I believe that "Congress has directly spoken to the precise question at issue" and that "the intent of Congress is clear" on this point, *Chevron*, 467 U.S. at 842, given that Congress specifically stated in § 402(d)(1) that it was using the word "child" "as defined in section 416(e) of th[at] title," the Commissioner's regulations would fail at *Chevron* step two. The question is not whether the Commissioner's *results* are reasonable, but whether (assuming statutory ambiguity) his *construction of the statute* is reasonable. As it would be irrational to acknowledge § 416(e)'s force with respect to every listed relation but one, the Commissioner's position is not entitled to deference here.

## II.

And even if one *did* grant *Chevron* deference, agreeing to ignore § 416(e) and apply only § 416(h)'s definition of "child," appellant would be entitled to a reversal. Section 416(h)(2)(B) provides,

> [An] applicant shall . . . be deemed to be the child
> of [an] insured individual if such insured individual

and the mother or father, as the case may be, of such applicant went through a marriage ceremony resulting in a purported marriage between them which, but for a legal impediment described in the last sentence of paragraph (1)(B), would have been a valid marriage.

The last sentence of paragraph (1)(B) specifies that these "legal impediment[s]" include "the lack of dissolution of a previous marriage" and "a defect in the procedure followed in connection with such purported marriage."

It is undisputed that W.M.S.'s parents, Mr. and Mrs. Schafer, were married in June 1992. If W.M.S. could show that there was some technical defect in the marriage paperwork, then, even under the majority's reading of the statute, W.M.S. would qualify as a "child" under § 416(h)(2)(B). *To deny him benefits because his parents' marriage was valid would be bizarre*. This provision again shows that Congress intended to include children of a valid marriage in its definition of "child," for what possible purpose would Congress have for covering children of a technically invalid marriage but not those of legally valid ones?

To adopt such a reading of the statute would raise serious constitutional questions. Indeed, appellant has brought an equal protection challenge to such a construction of the statute. Though a non-suspect statutory distinction will survive an equal protection challenge "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993), such a distinction between valid and technically invalid marriages might well fail rational basis review.

Here the canon of constitutional avoidance fully applies. When "choosing between competing plausible interpretations of a statutory text," courts are to choose in accordance with "the reasonable presumption that Congress did not intend the

alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 382 (2005). The simplest choice here (and, I believe, the legally correct one) would be to give effect to § 416(e)(1) and find that a biological child is, indeed, "the child . . . of an individual." But even within the majority's view that § 416(h) overrides § 416(e) there exists a plausible reading of § 416(h)(2)(B) that avoids an irrational distinction favoring technically invalid marriages.

In particular, one might read § 416(h)(2)(B) to implicitly include valid marriages. Under this view, paragraph (2)(B) simply extends the benefits granted under paragraph (2)(A)— a provision thought to include any "child of a valid marriage," 43 Fed. Reg. 57590, 57591 (1998)— to the children of marriages that Congress believed *ought to be considered valid* for its purposes.

Under this interpretation, *any* child of a marriage (who happened not to already qualify for benefits under paragraph (2)(A)) would satisfy § 416(h)'s definition of "child," whether or not a technicality undermined the marriage's validity. One would view the "but for" clause not as listing technical invalidity as a further requirement, but simply as excusing technical invalidity and extending benefits to reach the children of such marriages. Manifestly, this was Congress's intent, and in fact the paragraph's logical structure lends itself to such a reading. As formal logic would have it, it is true of *validly* married spouses that they "went through a marriage ceremony resulting in a purported marriage between them which, but for a legal impediment . . . , would have been a valid marriage." 42 U.S.C. § 416(h)(2)(B). The "but for" phrase simply instructs the Commissioner to consider a hypothetical scenario (thus the following subjunctive, "would have been") in which any technical defects are ignored; that is, in which marriages that fail on account of a technicality are made to look identical to valid marriages. Though children of valid marriages need not avail themselves of Congress's liberality, they, too, would be covered by paragraph (2)(B).

As § 416(h)(2)(B) is drafted in language logically applicable to valid marriages as well as technically invalid ones, and as the coverage of such was clearly Congress's intent, this is at least a plausible reading of the provision. And since this construction would avoid a serious constitutional question, it is preferable to the majority's reading, which would arbitrarily penalize the children of valid marriages because their parents' marriage proceedings happened not to suffer from some technical defect.

## III.

In this case a husband, facing the prospect of sterility just four months after marrying, voluntarily left behind his sperm for a singular purpose: to produce a child with his wife. That the two of them achieved their joint purpose because she did exactly what they both contemplated provides scant justification to distort statutory meaning, structure, and purpose and thereby disqualify their offspring from his federal statutory entitlement. The majority is surely correct in its implied lament that we live in a "brave new world," one in which the law lags behind technology, as it ever has. But that truism has never defined a "hard case." What must be recalled is that judicial opinions, like the statutes they interpret, are not merely words arranged on paper. They have real effects on real people.

Respectfully, I dissent.